# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-1273

_____

| | |
|---|---|
| Bettie Jean Whitmore, | * |
| | * |
| Appellant, | * |
| | * |
| v. | *  Appeal from the United States |
| | *  District Court for the Western |
| O'Connor Management, Inc., and | *  District of Missouri. |
| General Growth Management, Inc., | * |
| | * |
| Appellees. | * |

_____

Submitted: September 8, 1997

Filed: August 18, 1998

_____

Before HANSEN, JOHN R. GIBSON, and MORRIS SHEPPARD ARNOLD, Circuit
Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Bettie Whitmore worked in maintenance at a shopping mall that was first
managed by O'Connor Management, Inc., and subsequently by General Growth
Management, Inc. She alleges that her employers maintained a hostile environment by
subjecting her to sexual harassment from Marcel Bartee, a co-worker. The district
court held that Ms. Whitmore's Title VII claim, see 42 U.S.C. § 2000e-2(a)(1), against
O'Connor was time-barred. See Whitmore v. O'Connor Management, Inc., 899 F.

Supp. 425 (W.D. Mo. 1995). The district court further held that Ms. Whitmore did not produce sufficient evidence to establish that General Growth had subjected her to a hostile environment or that General Growth was on notice of activities that constituted actionable sexual harassment. Finally, the district court held that Ms. Whitmore's Missouri Human Rights Act claims, see Mo. Ann. Stat. § 213.055.1(1)(a), failed because she had not obtained the right-to-sue letter that Mo. Ann. Stat. § 213.111.1 requires.

Ms. Whitmore appeals from the district court's entry of summary judgment in favor of O'Connor and General Growth on the Title VII claims and the district court's dismissal of her Missouri Human Rights Act claims. We affirm the judgments of the district court[1] in all respects.

## I.

Ms. Whitmore began to work at the Ward Parkway Shopping Center in April, 1991, when O'Connor managed the mall. Ms. Whitmore worked in maintenance, cleaning restrooms. Mr. Bartee began hiding in supply closets, jumping out to frighten her when she was alone, touching her breasts and thighs, and telling other workers at the mall that he had engaged in sexual intercourse with her in the closet. (Ms. Whitmore was aware of the comments that Mr. Bartee had made about her to other employees, because they told her.) She told the lead person in maintenance, L. V. Wesley, that Mr. Bartee "was touching her and pulling on her clothes and pulling on her, stuff like this." Mr. Wesley testified that he spoke with the building superintendent, Mike Sweeney, about the problem, but only to say that Mr. Bartee was hanging around the food court, which is where Ms. Whitmore worked.

---

[1]The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

Mr. Bartee's pattern of sexual aggression culminated in two incidents in August, 1992. Ms. Whitmore had by then begun serving as the lead person in charge of maintaining the food court. She had permission to pass the time in a locked supply room before she came on duty. The first incident happened in that supply room, where Ms. Whitmore was paying some bills before beginning work. Mr. Bartee came into the room and grabbed Ms. Whitmore's breast. She threatened to report him to the office, and he grabbed her between her legs. He left when he heard someone's keys jingling nearby. Later that day, he grabbed her neck in the food court and threatened to kill her.

The second incident occurred later that week when Ms. Whitmore arrived at work almost five hours early. She locked the supply room and lay down on some boxes to take a nap. She woke up to find Mr. Bartee putting his hand between her legs. He then exposed himself, physically tried to force her to perform fellatio, and tore the zipper on her pants. When another worker came to the door, Mr. Bartee left. Ms. Whitmore reported the event to the operations manager, David Redford, who investigated it. Mr. Bartee denied that it had occurred, but Mr. Redford collected evidence that Mr. Bartee had offered another employee money for sex and had made sexual advances to still another. After the investigation, O'Connor suspended Mr. Bartee for ten days and warned him to stay away from Ms. Whitmore and not to retaliate against her. Ms. Whitmore reported the assaults to the police, and Mr. Bartee was criminally prosecuted.

O'Connor ceased managing the mall on January 31, 1993. Compass Retail, Inc., took over for five months, and then General Growth began managing the mall. General Growth hired Ms. Whitmore and Mr. Bartee to do the jobs that they had performed before. Don Benson, at that time the general manager of the mall, and Glenn Hibben, at that time the operations manager, learned about the assaults on Ms. Whitmore shortly after coming to work for General Growth at the mall.

Not long after General Growth assumed the management of the mall, Mr. Bartee's sister came into the food court, walked up behind Ms. Whitmore, and called her name. Ms. Whitmore turned around and the sister said, "[B]itch, you got Marcel in a lot of trouble." Ms. Whitmore said that Mr. Bartee's sister "had a purse, kept running her hand down in it ... like she had a gun or something." Ms. Whitmore further stated that she "took off to the back and got my bag and I ran over" to Mr. Hibben and told him about the apparent threat. Mr. Hibben said, "I thought all that stuff was over with between you and Marcel."

When the criminal case against Mr. Bartee came to trial, he was convicted of third-degree sexual abuse, a misdemeanor, and received probation. He retained his job after his conviction and continued to stare at Ms. Whitmore conspicuously for long periods of time as she worked in the food court. Mr. Bartee had been ordered by the criminal court to stay away from Ms. Whitmore, but the manager of a sandwich shop in the mall, Shannon Driscoll, said that Mr. Bartee would hang over the railing, looking down at the food court, "especially when Bettie was there. I can't emphasize that enough. I am talking 20 minutes in the same spot, not moving, for a long period of time." Ms. Driscoll described Mr. Bartee as watching Ms. Whitmore "to the point of where I would almost call it stalking." Mr. Bartee, moreover, continued to refer to Ms. Whitmore as his prostitute in such crude language that Ms. Driscoll reported it to Ms. Whitmore herself. Mr. Hibben said that he knew that Mr. Bartee was making derogatory comments about Ms. Whitmore, but that he did not follow up on it because it was "just hearsay." He did not ask Mr. Bartee about it because there was "no proof."

On appeal, Ms. Whitmore contends that her Title VII claim against O'Connor was timely because she was subjected to a continuing violation that began before O'Connor ceased managing the mall. She also maintains that she produced sufficient evidence to raise a question of material fact as to whether she was subjected to a hostile work environment when she worked for General Growth and whether General Growth was on notice that such an environment existed. Finally, she asserts that she was not

-4-

required to obtain a right-to-sue letter from the Missouri Commission on Human Rights, because she had received such a letter from the EEOC.

## II.

Ms. Whitmore attempts to avoid the statute of limitations bar to her Title VII claim against O'Connor by arguing that O'Connor is responsible for actions that continued after it ceased managing the mall. At first, she appears to be advancing a corporate successor theory, based on subsequent managers' failure to remedy Mr. Bartee's conduct. In her reply brief, however, Ms. Whitmore states that she "has never asserted that General Growth ... is the successor to O'Connor," and she also states, "Plaintiff has frankly admitted that she can find no clear precedent" for her theory but that it is "analogous" to successor liability. Actually, Ms. Whitmore seems to be arguing for predecessor liability, asking us to hold O'Connor liable for General Growth's conduct. In any event, there are many difficulties with Ms. Whitmore's legal argument, not the least of which is the fact that there was no sale of a business creating a predecessor-successor relation between the two corporations. Ms. Whitmore's argument appears to us to be little more than a request to impute liability in a case in which there is no legal authority for doing so, an invitation that we necessarily decline.

Ms. Whitmore also attempts to avoid the limitations bar by contending that the relevant period should begin on the day when she filled out an EEOC intake questionnaire, rather than on the day when she filed her formal charge. The general rule in Title VII cases is that unverified intake questionnaires do not constitute a formal charge. See Lawrence v. Cooper Communities, Inc., 132 F.3d 447, 450 (8th Cir. 1998), and Schlueter v. Anheuser-Busch, Inc., 132 F.3d 455, 458 (8th Cir. 1998). She contends nevertheless that she intended the answers to the questionnaire to initiate proceedings against O'Connor and that we should therefore treat them as a formal charge, but she cites us to no evidence indicating that "the questionnaire was intended to function as a charge in [her] case," Diez v. Minnesota Mining and Mfg. Co., 88 F.3d 672, 677 (8th Cir. 1996). See generally id. at 674-75 (age discrimination case,

discussing Title VII cases).  We therefore affirm the summary judgment entered against Ms. Whitmore on the Title VII claim with respect to O'Connor.

## III.

We entertain some considerable doubt about whether Ms. Whitmore has made out a sufficient case that Mr. Bartee continued to subject her to actionable sexual harassment during the period when General Growth managed the mall.  We pass over that point, however, because we think that the district court correctly granted summary judgment on the lack of proof of notice to General Growth of Mr. Bartee's continuing activities of an actionable nature, if any.

We note, first of all, that Ms. Whitmore herself, in her affidavit in connection with her EEOC charge, specifically admitted that she had not reported any of Mr. Bartee's conduct to General Growth's management.  That was, she said, because O'Connor "had not done anything before when I complained, [and so] I felt that there was no purpose to complaining at this time."  While this statement will not operate as an estoppel to prevent Ms. Whitmore from stating the contrary in her later lawsuit, we have repeatedly held that a plaintiff's sworn admission will require the production of " 'strong countervailing evidence' " if she takes a contrary position in later litigation, in order to survive a motion for summary judgment.  See, e.g., Dush v. Appleton Electric Co., 124 F.3d 957, 963 (8th Cir. 1997), quoting Mohamed v. Marriott International, Inc., 944 F. Supp. 277, 282 (S.D. N.Y. 1996).

Ms. Whitmore's litigating position in this case, however, is not so much that she informed General Growth directly of Mr. Bartee's behavior, as it is that General Growth's management was on notice of it.  The record does indeed amply demonstrate that General Growth was on notice of the outrageous and deplorable conduct on Mr. Bartee's part that occurred before General Growth took over management of the mall.  While there was evidence that Mr. Wesley knew of some of Mr. Bartee's actions during the relevant time (that is, while General Growth managed the mall), Mr. Wesley

is demonstratively not a part of General Growth's management. The fact, if it is one, that Mr. Hibben knew that Mr. Bartee's sister had threatened Ms. Whitmore in some unspecified way, is hardly sufficient to put General Growth on notice that Mr. Bartee had continued to harass Ms. Whitmore sexually. The same can be said of Mr. Hibben's testimony that he knew that Mr. Bartee was defaming Ms. Whitmore.

Ms. Whitmore doubtless suffered sexual harassment of the severest possible sort before General Growth assumed management of the mall. Whatever harm befell Ms. Whitmore thereafter, however, was not sufficiently communicated to General Growth to make it liable for any continuation of that harassment. Ms. Whitmore makes no claim that General Growth is vicariously liable for all acts of sexual harassment committed by its employees. We believe that in cases not involving vicarious liability, employees have some obligation to inform their employers, either directly or otherwise, of behavior that they find objectionable before employers can be held responsible for failing to correct that behavior, at least ordinarily. Absent some showing of negligence on the part of General Growth, Ms. Whitmore cannot prevail in the circumstances of this case. See Kinman v. Omaha Public School District, 94 F.3d 463, 469 (8th Cir. 1996).

Regardless of which party has the burden of proof on the issue of notice in these kinds of lawsuits, see Burlington Industries, Inc. v. Ellerth, No. 97-569, 66 U.S.L.W. 4634, 1998 WL 336326 (U.S. June 26, 1998), this record does not contain evidence that would support a finding that General Growth was on notice of Mr. Bartee's actions during the time that it was managing the mall. We note that General Growth prohibited Mr. Bartee from going within view of Ms. Whitmore immediately after she filed an EEOC charge complaining about his activities. In other words, an explicit communication to General Growth's management of Ms. Whitmore's complaints brought a prompt and appropriate remedial response. We therefore conclude that the district court correctly granted summary judgment to General Growth on Ms. Whitmore's Title VII claim.

IV.

Ms. Whitmore maintains that the district court erred in dismissing her claims under the Missouri Human Rights Act (MHRA) because she failed to obtain a right-to-sue letter from the Missouri Human Rights Commission. She argues that the right-to-sue letter from the state agency is rendered unnecessary by a work-sharing agreement between the state agency and the EEOC. The district court held that the work-sharing agreement did not provide for any such effect and that, in any case, the agencies could not agree to do away with a statutory requirement.

The work-sharing agreement that Ms. Whitmore has submitted for our review does not explicitly obviate the need for a right-to-sue letter, nor can we discern any such intent implicit in the agreement. Although we discover no Missouri case on point, we believe that the Missouri courts would consider a right-to-sue letter as a condition precedent, although not a jurisdictional prerequisite, to bringing an action under the MHRA. See Vankempen v. McDonnell Douglas Corp., 923 F. Supp. 146, 148-49 (E.D. Mo. 1996); see also Jones v. American State Bank, 857 F.2d 494, 499-500 (8th Cir. 1988) (same issue under Title VII). It would, therefore, perhaps have been possible to cure the defect by obtaining a right-to-sue letter after filing the case, see Perkins v. Silverstein, 939 F.2d 463, 471-72 (7th Cir. 1991), but Ms. Whitmore evidently made no attempt to do so. We therefore affirm the district court's dismissal of her MHRA claims.

V.

For the reasons given, we affirm the judgments of the district court.

JOHN R. GIBSON, Circuit Judge, dissenting in part.

Because I believe that the record presents an issue of fact as to whether General Growth had actual or constructive knowledge that Bartee was harassing Whitmore

-8-

during the time General Growth managed the mall, I respectfully dissent from Part III of the Court's opinion.

The Court today concedes that General Growth's managers knew of the earlier assaults. Supra at 3. Under Title VII, an employee's work environment is evaluated as a whole, rather than by viewing particular events in isolation from each other. See Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997) ("A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it 'into a series of discrete incidents.'"). Therefore, even though General Growth was not responsible for the earlier incidents, its managers' knowledge of Whitmore's earlier ordeal is relevant to how those managers should have responded to later developments involving the same harasser and the same victim.

The Court today places undue reliance on Whitmore's statement in her EEOC affidavit that she did not report the harassment to General Growth's management between "July 1993 and January 1994" or after returning to work in April 1994 after an injury. This statement is not necessarily inconsistent with Whitmore's deposition testimony that she reported Bartee's staring to L. V. Wesley in July or August 1993. At any rate, it is possible for an employer to have notice of a situation without the victim herself reporting it. Moreover, Whitmore's EEOC affidavit specifically mentions that she reported to General Growth the threat by Bartee's sister.

Whitmore testified at her deposition that in the middle of July or beginning of August 1993, after General Growth had taken over the management of the mall on July 1, 1993, she complained to L.V. Wesley that Bartee was staring at her. Whitmore then reiterated her complaint when Bartee's conduct did not improve. Wesley told her he reported her complaint to Sweeney. The majority gives Whitmore's complaint no effect because, "Mr. Wesley is demonstratively not a part of General Growth's management." Supra at 7. However, the record demonstrates that Wesley was General Growth's agent for the purpose of reporting complaints such as Whitmore's; Mike Sweeney, a

General Growth supervisor, agreed that, as Bartee's lead person, Wesley had the duty to report to management "problems . . . between employees for whom he was the lead person." In Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103 (8th Cir. 1998), Bales complained of sexual harassment to Bollenbaugh, a person that Wal-Mart contended was "not Bales's manager nor was she a supervisor." Id. at 1110. However, we looked to deposition testimony that Bollenbaugh had "supervisory authority" over Bales and that it would be "appropriate" for Bales to complain to her. Id. We held that "[a]lthough [Bollenbaugh was] not the most senior management person to whom Bales might have complained," there was sufficient evidence that Wal-Mart knew or should have known of the harassment. Id. Similarly, the deposition testimony in this case shows that Wesley had supervisory authority over Bartee and that it was Wesley's duty to report problems with Bartee up the chain of command.

Moreover, Wesley reported enough to put General Growth's management on notice about the staring. Hibben testified that Mike Sweeney told him, "Bettie believes that Marcel is watching her from the shadows or from the corners, or something along those lines." Hibben was not able to tell when he had this conversation with Sweeney. Nevertheless, his statement fits with Whitmore's testimony that she told Wesley of the problem in July or August 1993 and Wesley said he would report it to Sweeney. Taking these statements all together, a jury could infer that Hibben knew of the problem at about that time.

Hibben also testified that he knew of the defamatory statements Bartee was making about Whitmore.[2] Hibben defended his failure to do anything about the situation, saying the information was "just hearsay" and there was "no proof." If nothing else had happened between Bartee and Whitmore, this might be excusable. But in fact, Hibben knew that Whitmore had already suffered "sexual harassment of the

---

[2]Bartee had been saying that Whitmore was his prostitute.

severest possible sort," supra at 7, from Bartee. In this context, a jury could find his failure to investigate reports of further misconduct was willful blindness.

Additionally, the record is clear that Hibben knew of the threat by Bartee's sister in August 1993. The sister came to the mall and threatened Whitmore, either carrying or pretending to carry a gun. Whitmore testified that Hibben was nearby when the incident occurred, and that Whitmore "got [her] bag" and "ran over" to Hibben and told him the sister "had threatened me." Considering that Whitmore had accused Bartee of assaulting her and that Bartee was being prosecuted criminally, a trier of fact could find that the threat was attributable to Bartee. More to the point, the trier of fact could also find that a link between Bartee and the threat should have occurred to Hibben. In fact, it did occur to him, since he said to Whitmore, " I thought all that stuff was over with between you and Marcel." According to Whitmore, Hibben then offered to send a security guard to escort Whitmore to her bus, and walked away. If Hibben thought Whitmore needed a security guard to escort her to her bus that day, a jury could find that he should have taken further action. At the very least, General Growth should have investigated this incident to determine if Bartee was behind the threat, and for that matter, to find out more about the nature of the threat.

The Court today dismisses General Growth's knowledge about the threat, stating, "The fact, if it is one, that Mr. Hibben knew that Mr. Bartee's sister had threatened Ms. Whitmore in some unspecified way, is hardly sufficient to put General Growth on notice that Mr. Bartee had continued to harass Ms. Whitmore sexually." Supra at 7. Here, the evidence supports a finding of a threat of retaliation against an employee by a person who has already committed two sexual assaults against that employee. I will not attempt to catalog the cases in which we have upheld harassment claims for less severe conduct, but by way of example I compare Whitmore's claim to that in our recent case of Rorie v. United Parcel Service, Inc., No. 97-3678 (8th Cir. July 23, 1998). There, we said: "[W]e cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute

-11-

sexual harassment as a matter of law." Slip op. at 7. General Growth had notice that Whitmore was still being threatened <u>at work</u> after having been sexually assaulted twice <u>at work,</u> and that she was afraid. In my opinion, this is more egregious than being told she smelled good, and it is sufficient to go to a jury.

Finally, there is Shannon Driscoll's testimony that after being charged with the assault Bartee would stand in the mall and stare at Whitmore for twenty minutes at a time. Driscoll described Bartee as watching Whitmore "to the point of where I would almost call it stalking." The standard for negligence liability is that the employer knew or <u>should have known</u> of the harassment and failed to remedy it. <u>Varner v. National Super Markets, Inc.,</u> 94 F.3d 1209, 1213 (8th Cir. 1996), <u>cert. denied,</u> 117 S.Ct. 946 (1997); <u>Hall v. Gus Const. Co.,</u> 842 F.2d 1010, 1015-16 (8th Cir. 1988); <u>Adler v. Wal-Mart Stores, Inc.,</u> 144 F.3d 664, 673-75 (10th Cir. 1998); <u>see generally</u> <u>Faragher v. City of Boca Raton,</u> 118 S.Ct. 2275, 2289 (1998). I believe this case presents a jury issue as to whether General Growth should have known of Bartee's conduct.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-