# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3364
_____

Kevin Nutt; Lisa Nutt

*Plaintiffs - Appellees*

v.

Stafford Kees; Carroll County Nursing & Rehab Center, Inc, an Arkansas
Corporation; Osceola Nursing Home LLP, an Arkansas Limited Liability Partnership

*Defendant*s

Osceola Therapy & Living Center, Inc., an Arkansas Corporation

*Defendant - Appellant*

Osceola Healthcare PLLC, an Arkansas Professional Limited Liability Company;
HOPE Healthcare LLC, an Arkansas Limited Liability Company

*Defendant*s

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro
_____

Submitted: June 10, 2015
Filed: August 12, 2015
_____

Before GRUENDER, MELLOY, and BENTON, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Kevin and Lisa Nutt successfully sued their former employers under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, for two claims: delinquent contributions and breach of the fiduciary duty of care. The district court found that the Nutts' former employers could not provide adequate relief and thus relied on a theory of successor liability to hold Osceola Therapy & Living Center, Inc. ("OTLC") liable. OTLC appeals, and we reverse.

I.

Kevin and Lisa Nutt were employed by Osceola Healthcare, PLLC, and worked at Osceola Nursing Home. During the Nutts' employment, Osceola Healthcare withheld funds from the Nutts' paychecks as "pre-tax insurance." The Nutts believed that these funds were withheld to pay for their health insurance. After Kevin was injured in an ATV accident, the Nutts learned that Osceola Healthcare had not paid their insurance premiums. As a result, their policy had lapsed, and the Nutts owed more than $233,000 for the medical services provided to Kevin. When Lisa called the insurance company, a representative told her that the insurer could reinstate the policy and pay the medical bills if Osceola Healthcare made the delinquent premium payments.

Lisa told Osceola Nursing Home's administrator about the lapsed insurance and her husband's medical bills. The administrator said that he would discuss the matter with Osceola Healthcare's majority partner, Stafford Kees. Kees did not correct the delinquent payments. Instead, in late July 2010, Kees and the administrator met with the Nutts and proposed that they file for bankruptcy to discharge the medical debt. Kees and the administrator then offered the Nutts a check for $1,500 to cover the bankruptcy expenses. The Nutts refused. As a result, they remained liable for approximately $233,000.

Around this time, Kees was seeking a buyer for Osceola Nursing Home. Kees entered into a purchase and sale agreement with Jim Cooper, a businessman who specialized in turning around financially troubled nursing homes, in late July 2010. Cooper's company, Berryville Properties, LLC, ultimately took title to the real property and assets when the sale closed in December of the same year. In the interim period before the closing, the purchase and sale agreement provided for a temporary lease in which Cooper "and/or his assigns" would assume management and operation of the nursing home. During this temporary lease period, Cooper or his assign would receive the residents' payment and, in exchange, pay rent to Kees. Cooper assigned this lease to OTLC, a nursing-home operation company created for the project and owned solely by Bobby Hargis. Though Hargis's company was independent from Cooper and Berryville Properties, Hargis regularly had worked with Cooper in previous nursing-home ventures, and Hargis attended meetings with Kees and Cooper leading up to the nursing-home sale. OTLC took over operation of the nursing home after the execution of the purchase and sale agreement, and OTLC continued to operate the facility for Cooper and Berryville Properties for approximately three years.

Not long after the initial takeover, Cooper met with the nursing home's department heads and told them that he planned to do necessary repairs, pay contractors, and "get everything where it need[ed]" to be. At a second meeting with all nursing-home employees, Cooper assured the staff that he would address the health-insurance problem and pay all debts. Kevin Nutt met with Hargis after this meeting to tell him about the outstanding medical bills from the ATV accident. A few days later, OTLC fired both Lisa and Kevin Nutt.

The Nutts sued several parties as a result of these events, including Osceola Healthcare and Osceola Nursing Home ("the Osceola defendants"), Kees, and OTLC. The district court entered default judgment against the Osceola defendants after their attorneys withdrew due to nonpayment. After a bench trial, the court found Kees

individually liable under ERISA for both breach of the fiduciary duty of care and delinquent contributions. Because neither Kees nor the Osceola defendants could satisfy the judgment, the court relied on a theory of successor liability to hold OTLC liable for the Nutts' medical bills. OTLC now appeals.

## II.

The doctrine of successor liability provides an equitable exception to the general rule that a buyer takes the assets of his predecessor free and clear of all liabilities other than valid liens and security interests. 15 W. Fletcher, Cyclopedia of the Law of Corporations § 7122. This form of liability allows a plaintiff with a claim against the seller to collect from the purchaser. *Id.* Such liability ensures that a victimized plaintiff has a complete remedy for the harm he suffered, even if the actual wrongdoer is defunct or otherwise unable to redress his damages. *See Prince v. Kids Ark Learning Ctr., LLC*, 622 F.3d 992, 995 (8th Cir. 2010) (per curiam).

Our court has not yet determined whether to apply the federal common law doctrine of successor liability in the ERISA context. *Reed v. EnviroTech Remediation Servs., Inc.*, 834 F. Supp. 2d 902, 909 (D. Minn. 2011); *compare Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 93-96 (3d Cir. 2011) (recognizing successor liability in actions seeking recovery of delinquent pension fund contributions under ERISA after an asset sale); *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1326-28 (7th Cir. 1990) (same); *Haw. Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 294-95 (9th Cir. 1987) (same); *see also Stotter Div. of Graduate Plastics Co., Inc. v. Dist. 65, United Auto Workers*, 991 F.2d 997, 998-99, 1002 (2d Cir. 1993) (holding that an arbitrator did not exceed his authority by imposing liability on the successor-employer for delinquent contributions owed under the predecessor's collective bargaining agreement with a union). And the parties dispute whether such application is appropriate here. We need not decide this issue in the present case.

Even if we assume that successor liability applies in the ERISA context, we conclude that the district court clearly erred in its factual findings and improperly weighed the equities when it held OTLC liable as the successor of the Osceola defendants.

We review a district court's decision to impose liability on a defendant-successor for abuse of discretion. *See Prince*, 622 F.3d at 994. "An abuse of discretion occurs when the district court bases its decision on an error of law or a clearly erroneous finding of fact." *First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1044 (8th Cir. 1996). Likewise, a court abuses its discretion in an equity determination if it "commits a clear error of judgment in weighing [the relevant] factors." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009).

Several considerations guide our review of the district court's decision to impose successor liability. *See, e.g.*, *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974) (listing nine factors relevant to successorship). However, "[t]he ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." *Prince*, 622 F.3d at 995 (quoting *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 554 (6th Cir. 2006)). Before imposing successor liability, a court must balance the plaintiff's interests, the defendant's interests, and federal policy. *See Cobb*, 452 F.3d at 554. Imposing successor liability is appropriate only if it "strike[s] a proper balance between on the one hand preventing wrongdoers from escaping liability and on the other hand facilitating the transfer of corporate assets to their most valuable uses." *EEOC v. Vucitech*, 842 F.2d 936, 944-45 (7th Cir. 1988).

The district court correctly noted that several factors weigh in favor of extending successor liability in the present case. The record leaves no question that the Nutts were "victimized employee[s]." *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 185 (1973). And, as the court observed, neither Kees nor the Osceola

-5-

defendants could provide adequate relief to the Nutts. Osceola Healthcare and Osceola Nursing Home did not pay their attorneys, and as a result, the Osceola defendants suffered a default judgment. Kees proceeded *pro se*, and he since has filed for bankruptcy. In contrast, OTLC, by all indications, was a profitable business. Indeed, OTLC successfully operated the nursing home for Cooper and Berryville Properties for several years before Hargis retired and a second company took over the operation lease.

Were these considerations the only governing factors, the district court's analysis might well be sound. The successor-liability inquiry, however, does not end here. Before imposing liability, a court must consider the countervailing interests of the defendant-successor and the larger policy goal of facilitating the free transfer of assets. *Cobb*, 452 F.3d at 554; *Vucitech*, 842 F.2d at 944-45. These concerns generally weigh against expanding liability for a predecessor's debt. *See Vucitech*, 842 F.2d at 944. Accordingly, before imposing financial liability for a predecessor's past misdeed, courts look for two factors to ensure that liability is proper—notice and the direct transfer of assets from the predecessor. *See Golden State*, 414 U.S. at 185.

These two factors guard against unfairness because they provide the successor with the opportunity to protect its interests either by acquiring the assets from the seller for a lower purchase price or by insulating itself from liability through an indemnity clause in the sales contract. *See id.*; *see also Moriarty v. Svec*, 164 F.3d 323, 336 (7th Cir. 1998) (Manion, J., concurring) ("[T]he rule of corporate successor liability is premised on the assumption that the purchaser could negotiate the acquisition price based on the potential liability."). Absent these circumstances, our case law suggests that the balance of equities does not favor the plaintiff. In *Whitmore v. O'Connor Management, Inc.*, for example, we rejected a plaintiff's request for something "analogous to successor liability" under Title VII because the plaintiff's argument suffered from several flaws, "not the least of which is the fact that there was no sale of a business creating a predecessor-successor relation between

the two corporations." 156 F.3d 796, 799 (8th Cir. 1998) (internal quotation marks omitted). And in *Dominguez v. Hotel, Motel, Restaurant & Miscellaneous Bartenders Union, Local No. 64*, we refused to impose successor liability in a discrimination case because the defendant acquired the predecessor's assets at a foreclosure sale without any notice of the plaintiff's pending discrimination allegations. 674 F.2d 732, 733 (8th Cir. 1982) (per curiam); *accord Korlin v. Chartwell Health Care, Inc.*, 128 F. Supp. 2d 609, 614 (E.D. Mo. 2001) (holding that privity between the predecessor and successor employer is necessary for successor liability).

In its order, the district court imposed liability on OTLC because it found that (1) the "language of the Purchase and Sale Agreement, as well as the lease between Mr. Cooper and OTLC providing that OTLC would manage and operate the facility, made OTLC the purchaser of the assets of Osceola Nursing Home" and (2) nothing in the record suggested that OTLC was "prevented from taking the potential liability to plaintiffs into account in negotiating the final acquisition price set at the closing." We conclude that the court clearly erred by characterizing OTLC as a purchaser. OTLC did not buy the nursing home. Even the Nutts' counsel acknowledged at oral argument that the only parties to the purchase and sale agreement were the seller—Kees—and the purchasers—Cooper and Berryville Properties.[1] OTLC was an independent entity that leased the property and assets by way of an assignment from the facility's actual purchasers.

The distinction between OTLC's role as a lessee and that of a purchaser radically shifts the balance of equities. As a third-party lessee, OTLC could not shield itself from inheriting liability because it did not negotiate directly with the seller. Cooper and Berryville Properties, not Hargis and OTLC, bargained for the

---

[1]The Nutts did not name the actual purchasers, Cooper and Berryville Properties, as defendants in this action.

purchase price, and Cooper and Berryville Properties, not Hargis and OTLC, negotiated the terms, such as a possible indemnity provision. Moreover, even if OTLC somehow could have adjusted its lease to account for the potential liability, OTLC did not receive timely notice of the potential liability. The district court acknowledged that OTLC learned of the medical bills only *after* the lease had been assigned and OTLC took over operations of the facility in early August 2010. At this point, as the district court explained, OTLC "had responsibilities to make sure the facility's patients were taken care [of] based on the [lease assigned from the] Purchase and Sale Agreement and state regulations." OTLC simply did not have the option of abandoning the nursing home and its patients.

In light of this analysis and the court's clearly erroneous characterization of OTLC as the purchaser with the ability to "tak[e] the potential liability to plaintiffs into account in negotiating the final acquisition price set at the closing," we conclude that the district court abused its discretion. After all, OTLC was not a party to the unlawful practices of Kees and the Osceola defendants, and OTLC operated the nursing home without any significant connection to these culpable parties. *See Golden State*, 414 U.S. at 171 n.2; *Prince*, 622 F.3d at 996. Though OTLC took over the operations of Osceola Nursing Home, mere continuation does not create liability. *See Prince*, 622 F.3d at 995 (noting that the *MacMillan* factors for successor status, including whether the successor-defendant substantially continued the operations of the wrongdoer, are not themselves the test for liability). If the doctrine of successor liability required no more than subsequent operation, the doctrine inevitably would discourage the free transfer of assets to their most valuable uses. *See Vucitech*, 842 F.2d at 944-45.[2]

---

[2]We do not foreclose the possibility that a lessee, under appropriate circumstances, could be liable for the debts of a seller that previously operated the facility. *See Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 358 (7th Cir. 2014). Such liability could attach, for example, when a lessee and buyer are "substantial[ly] interrelated[]" such that any differences between the two are merely

## III.

For the foregoing reasons, we reverse.

_____

---

"artificial distinction[s]" designed to mask an asset sale. *Id.* Here, however, the Nutts do not argue, nor have they produced evidence to suggest, that OTLC and the actual purchasers were separated by such artificial distinctions.