**Alissa R. TOPPERT, Plaintiff,**

v.

**NORTHWEST MECHANICAL, INC. and Joe Schadt, Defendants.**

**No. 3:12–cv–09–RAW.**

United States District Court, S.D. Iowa, Davenport Division.

Aug. 13, 2013.

William P. Rector, Jeffrey David Jacobs, Bozeman Neighbor Patton & Noe, Moline, IL, for Plaintiff.

Diane M. Reinsch, Abbey Chun Furlong, Lane & Waterman LLP, Davenport, IA, for Northwest Mechanical, Inc.

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSS A. WALTERS, United States Magistrate Judge.

## TABLE OF CONTENTS

I. JURISDICTIONAL ISSUES
 A. Iowa Civil Rights Act
 1. Arguments
 2. Law & Analysis
 B. Davenport Civil Rights Act
 1. Arguments & Background
 2. Law & Analysis

II. MERITS OF TITLE VII CLAIMS
 A. Facts
 B. Summary Judgment Standard
 C. Sexual Harassment
 D. Discriminatory Discharge
 1. Indirect Evidence Standard
 2. Reason No.1: Violating Privacy Laws
 a. Changed reason
 b. Honest belief and good faith investigation
 i. Law
 ii. Application
 c. Similarly situated male employee
 3. Reason No. 2: Poor Performance
 E. Retaliation

## III. CONCLUSION

Defendants' Motion for Summary Judgment [15] is before the Court following oral argument. This is an employment discrimination case asserting claims under the Iowa Civil Rights Act, the Davenport Civil Rights Ordinance, and Title VII of the 1964 Civil Rights Act.

## I.

### JURISDICTIONAL ISSUES

After being terminated by Defendant Northwest Mechanical, Inc. ("NWMI"),[1] Plaintiff filed a complaint with the Davenport Civil Rights Commission ("DCRC"), which cross-filed with the Equal Employment Opportunity Commission("EEOC"), and then Plaintiff filed a complaint with the Iowa Civil Rights Commission ("ICRC"). An ICRC Administrative Law Judge ("ALJ") responded to the complaint submission by returning the submitted materials and sending Plaintiff a letter, which included the following excerpt:

> Recently the Davenport Civil Rights Commission obtained a contract with the federal government, the Equal Employment Opportunities Commission. Because they have a contract with the federal government, the Davenport Commission is not required to cross-file the charges of discrimination they receive with the state of Iowa's civil rights Agency. This is a change in how the Davenport and State Commissions coordinated enforcement activities, which you may not have been aware of the change in procedures. Since the charge

is being investigated by the Davenport Commission, any investigation by the State Commission would be duplicative. Therefore, I am returning the materials you submitted to the State Commission.

> If you have any questions, you may certainly call me directly.

(Pl.'s App. 13, Letter from Cowdrey to Rector [20–4]). From this letter, it is apparent that the ICRC did not keep the complaint materials, and it was not going to investigate the case. However, the parties do not agree on the meaning of the ALJ's letter and how Plaintiff should have proceeded. The parties have not submitted any other materials regarding Plaintiff's complaint that the ICRC sent to either party or the DCRC.

DCRC proceeded to investigate the complaint and concluded there was probable cause for discrimination. At that point, Plaintiff and Defendants engaged in DCRC-sponsored conciliation. After the conciliation failed and the DCRC did not set the case for public hearing, Plaintiff requested right to sue letters[2] from the DCRC, the ICRC, and the EEOC. Plaintiff received a "Notice of Decision–Notice of Right to Sue" from the DCRC and a "Notice of Right to Sue" from the EEOC. (Am. Compl. Exs. A, B [7–1] [7–2]). It is undisputed that Plaintiff did not obtain a right to sue letter from the ICRC. (*Compare* Pl.'s Supp. App. 1, Supp. Aff. of William P. Rector [25–1] *with* Defs.' Br. in Support of Summ. J. 8 [7]).

The lack of right to sue letter from the ICRC raises questions regarding whether

---

**1.** Unless otherwise noted, the Court will use "Defendant" to refer to the corporation Northwest Mechanical, Inc. When discussing Defendant Joe Schadt, the Court will use his surname.

**2.** A right to sue letter follows from an administrative release. It signals that the administrative stage of the case is over and the plaintiff has permission to file suit in the district court.

Plaintiff's Iowa Civil Rights Act ("ICRA") and Davenport Civil Rights Ordinance claims may proceed.

### A. Iowa Civil Rights Act

Defendants argue that Plaintiff's Iowa Civil Rights Act claims, Counts IV, V, and VI, fail as a matter of law. In its most basic form, the ICRA requires that before initiating a lawsuit, a plaintiff must 1) file a complaint with the ICRC, 2) then request a right to sue letter from the ICRC, and 3) finally, file suit no later than ninety days after the ICRC issued the right to sue letter. Iowa Code § 216.16. Defendants argue that the Court does not have subject matter jurisdiction over the claim because Plaintiff failed to exhaust her administrative remedies when she did not obtain a right to sue letter from the ICRC.[3] The issue is whether the statutory requirement to obtain a right to sue letter from the ICRC was satisfied by obtaining a right to sue letter from the DCRC or the EEOC.

#### 1. Arguments

Plaintiff argues that her right to sue letters from the EEOC and the DCRC satisfy the statutory requirement to obtain a right to sue letter from the ICRC. Plaintiff bases this argument in part on the ALJ's letter. Plaintiff interprets the letter to mean that the ICRC was deferring the case to the DCRC for investigation *and* resolution, including issuance of the right to sue letter. With that understanding, Plaintiff thought she would exhaust her administrative remedies with the ICRC by exhausting her administrative remedies with the DCRC. Plaintiff states that there was a contract for deferral, but, assuming

she is referring to a contract between ICRC and DCRC, evidence of that contract is not in the motion papers.

In contrast, Defendants understand the letter to mean only that investigation would be conducted by the DCRC with the ICRC retaining the responsibility for issuing a right to sue letter. Defendants point out the ALJ only indicated that the ICRC would not investigate; she did not say that the ICRC would not issue a right to sue letter. Defendant argues that the Court should not read into the situation a contract for resolution and issuance of a right to sue letter where the Court has no evidence that a deferral contract had been granted because the administrative rules make clear such a contract must be established in order to receive "referral" or "deferral" agency status.

#### 2. Law & Analysis

Plaintiff is correct in stating that Iowa Code §§ 216.5 and 216.19 make clear that a plaintiff's rights should not be affected by filing with a referral agency and a complaint may be referred for investigation. However, Plaintiff's application of the law is flawed.

Plaintiff asserts that the DCRC is a deferral agency. According to the Iowa Administrative Rules, in order to become a deferral agency, the ICRC must grant the local commission a deferral contract. The Iowa Administrative Rules detail the process of obtaining a contract and make clear that applications for contracts may be denied. Iowa Administrative Code Rule 161–1.6(4). Yet, Plaintiff has not provided proof that DCRC had such a contract with

---

**3.** In *Smith v. ADM Feed Corp.,* 456 N.W.2d 378, 381 (Iowa 1990), the Iowa Supreme Court held "A district court has no jurisdiction over a plaintiff in a civil rights action unless he first exhausts his administrative remedies." More recently, in *Dohmen v.* *Iowa Department for the Blind,* 794 N.W.2d 295, 300–01 (Iowa Ct.App.2010), the Iowa Court of Appeals said the exhaustion of administrative remedies is not a requirement of subject matter jurisdiction, but rather a condition precedent to suit.

ICRC at that time. Additionally, assuming there was a deferral contract, Plaintiff has not addressed the possibility that the ICRC did not delegate the issuance of the right to sue letter. This is important because Iowa Administrative Code Rule 161–1.6(4)(e)(9), which is referring to a deferral agency, states that "[t]he commission will not necessarily be bound by the agency's conclusions of law." Where there is no proof that the DCRC has a deferral contract, the Court cannot find that the DCRC has the right to bind the ICRC. Doing so would confer greater rights to a local commission without a contract than a local commission with a contract. It is not logical to find that a commission that has gone through a more rigorous review and obtained a contract, but still does not have the ability to bind ICRC with their findings, has less authority than those commissions that were unsuccessful in obtaining a contract.

In *Gray v. Kinseth Corp.*, the Iowa Supreme Court cautioned against reading a delegation of rights and responsibilities from the ICRC to a local agency, where the ICRC had not explicitly authorized it. *See* 636 N.W.2d 100, 103 (Iowa 2001). In *Gray,* the local commission sent a letter to the ICRC saying that it was cross-filing a claim with the ICRC but that the local commission would handle the investigation. *Id.* at 101. In response, the ICRC sent back a pre-printed form. *Id.* There were several boxes that could be marked, each indicating how the ICRC was processing the case. *Id.* The ICRC marked a box indicating that it docketed the case and will "await results of your processing." *Id.* The ICRC did not mark the box indicating that the state commission was referring or deferring the contract pursuant to a referral or deferral contract. *Id.* An issue arose because the local commission issued a right to sue letter before the ICRC issued a right to sue letter. Each right to

sue letter started a ninety-day clock by which the plaintiff had to file suit in order to preserve his legal rights. The plaintiff's suit was untimely according to the period set by the local commission's right to sue letter but timely according to the period set by the ICRC letter. *Id.* at 101–02. The defendant argued that the plaintiff could not proceed on his ICRA claims because the clock started by the local commission's right to sue letter was binding on those claims. The Iowa Supreme Court held that the ICRC right to sue letter controlled the ICRA claims because there was not a referral or deferral contract between the parties authorizing the local commission to bind the ICRC. *Id.* at 103.

Similarly, the Eighth Circuit Court of Appeals has considered whether an EEOC right to sue letter may satisfy a state's statutory requirement to obtain a right to sue letter from the state agency. In *Whitmore v. O'Connor Mgmt., Inc.*, the Eighth Circuit considered Plaintiff's argument that she did not need to obtain a right to sue letter from the Missouri Human Rights Commission to proceed on her state law claims because she had received a right to sue letter from the EEOC and the work-sharing agreement meant that was sufficient. 156 F.3d 796, 799 (8th Cir. 1998). In other words, she did not need to obtain a right to sue letter from the state agency because she had one from the federal agency. The Eighth Circuit upheld the trial court's holding that the work-sharing agreement did not dispense with the Missouri statutory requirement for a state commission right to sue letter. *Id.* at 800. Even though the Missouri Supreme Court had not ruled on the issue, the Eighth Circuit held that the Missouri statute's requirement for a right to sue letter was needed to proceed with her case. *Id.* at 800–01.

Neither the EEOC nor the DCRC right to sue letter satisfies the statutory requirement that Plaintiff obtain a right to sue letter from the ICRC in order to proceed on her ICRA claims. *Gray* illustrates that the ICRC does not always delegate resolution, but rather it sometimes delegates solely investigation. Further, delegation of resolution must be done explicitly. Plaintiff has not provided evidence that there was a deferral contract and that it included delegating the issuance of the right to sue letter. Without such evidence, the Court cannot find that the resolution of the case was referred to the DCRC and the statutory requirement of obtaining a right to sue letter from the ICRC was eliminated. Plaintiff did not exhaust her administrative remedies for her ICRA claims. **Defendant's Motion for Summary Judgment on Counts IV, V, and VI is granted.**

### B. Davenport Civil Rights Act

#### 1. Arguments & Background

The Court has held that Plaintiff failed to exhaust her administrative remedies on her ICRA claims because she did not receive a right to sue letter from the ICRC. The Court has also held that the DCRC did not have the authority to issue a right to sue letter on behalf of the ICRC.

In light of these holdings, the Court considers Defendants' argument that Plaintiff's Davenport Civil Rights Ordinance ("DCRO") claims must also fail as a matter of law because the DCRC did not have authority to issue a right to sue letter on those claims. Plaintiff contends that the DCRC implicitly had authority to issue right to sue letters.

The DCRO as it was in effect for the relevant period made no mention of administrative releases. (*See* Defs.' Notice of Supplemental Auth. [26]; Davenport Civil Rights Ordinance Ch. 2.58 [26–1]). After Plaintiff received what both parties sometimes refer to as the DCRC "right to sue" letter, the Davenport City Council amended the ordinance to provide for administrative releases. (*See* Am. Compl. ¶ 9 [7]; Ex. B [7–2] (stating "Notice of Decision–Notice of Right to Sue" was issued by DCRC on October 26, 2011); Defs.' App. 234–35, Notice of Davenport Civil Rights Ordinance Amendment [22–1] (stating that the City Council approved adding § 2.58.090 "Administrative Release" to the Davenport Municipal Code on April 11, 2012)). The Court assumes, without deciding, that the DCRO authorized the DCRC to issue right to sue letters at the time that one was issued to Plaintiff.[4] The Court concludes below that the DCRC does not have such authority under state law.[5]

---

4. There is evidence to suggest that the city and the DCRC assumed the DCRC had the authority to issue right to sue letters before the ordinance was amended. First, the official announcement published in the Quad Cities Times stated: "Ordinance amending Chapter 2.58 entitled 'Civil Rights Commission' by adding a new section 2.58.090 to clarify that Administrative Releases may be issued in accordance with state and federal law and by deleting subsection 2.58.180(H)." (Defs.' App. 234–35, Notice of Davenport Civil Rights Ordinance Amendment [22–1]). It was explicitly stated that the ordinance was passed "to clarify" that the DCRC has authority to issue an administrative re-

lease. The plain meaning of the word "clarify" is to resolve any ambiguity in favor of the already established position or decision.

5. The authority of the DCRC to issue right to sue letters entitling a complainant to bring an action in an Iowa court for violation of the DCRO was not addressed in the parties' initial briefing. However, the subject was addressed at the June 6, 2013 hearing on the summary judgment motion and by notice of supplemental authority filed by Defendant the same date. Defendant provided a copy of the *Quick* state district court decision discussed infra at 12–15. Defendant characterized the decision as holding "a local civil rights com-

## 2. Law & Analysis

The Iowa Supreme Court considered "whether a city has power to confer jurisdiction in the district court by city ordinance" in *Molitor v. City of Cedar Rapids*, 360 N.W.2d 568, 568 (Iowa 1985). It held that the city could not confer such jurisdiction when the court invalidated a city housing code that stated a person could seek judicial review of a housing board of appeals decision in the district court. *Id.* The court held that the city could not confer jurisdiction because its powers derive from the state and although the state housing code gives municipalities the authority to enact certain enforcement procedures, it does not provide authority for judicial review.

In *Molitor*, the court discussed the limits of municipal "home rule" power to affect state court jurisdiction:

> The constitutional and statutory framework makes jurisdiction of state courts "a state affair rather than a municipal affair." 2 E. McQuillan, The Law of Municipal Corporations § 4.95 at 165 (1979). If municipal corporations had the power to confer jurisdiction on the district court, the jurisdiction of the court potentially could be fragmented into as many components as there are municipalities.
>
> Home rule does not give municipal corporations power to legislate for the state. The constitution gives them certain power only "to determine their local affairs and government" when "not inconsistent with the laws of the general assembly." Iowa Const. art. III, § 38

A. Municipal power over local and internal affairs does not include authority to determine the jurisdiction of a state court. We find no basis in the constitution or statutes for holding otherwise. *Id.* at 569. The court also stated that its prior decision in *Cedar Rapids Human Rights Commission v. Cedar Rapids Community School District*, 222 N.W.2d 391 (Iowa 1974), "exemplifies how municipal authority to provide for judicial review must derive from and accord with state law." *Id.* In *Cedar Rapids Human Rights Commission*, the court invalidated the ordinance 1) for not doing what the ICRA said the city must do: provide judicial review and 2) for doing more than the ICRA said it could do: create a city human rights commission with the power of a court. *Id.* (*citing Cedar Rapids Human Rights Comm'n*, 222 N.W.2d at 393–98, 402).

An unpublished Iowa District Court decision has considered whether under the ICRA a city has power to confer jurisdiction in a district court for violating a city ordinance. *Quick v. Emco Enters., Inc.*, No. CL 103108, 2009 WL 7230815, *4 (Iowa Dist. Jan. 16, 2009), *aff'd without opinion by* No. 09–0311, 2009 WL 5126144, *4 (Iowa Ct.App. Dec. 30, 2009). Although it is not binding, the Court considers its persuasive value. In *Quick*, an employee alleged that his employer discriminated against him on the basis of sexual orientation in violation of the Des Moines Human Rights Ordinance. *Id.* at *3. At that time, the ICRA did not prohibit employment discrimination on the basis of sexual orientation.[6] The employee filed a complaint

---

mission does not possess the authority to confer jurisdiction on the state district court." (Notice 1 [26] ).

**6.** The employee also filed a complaint with the ICRC, alleging discrimination based on sex. *Id.* at *1. The ICRC issued a right to sue

letter. *Id.* The district court dismissed this claim on summary judgment, holding that the claims were not sex discrimination claims but were actually sexual orientation claims, which could not survive summary judgment because the 2007 amendments had not taken effect and the ICRA as it was in effect during

with the Des Moines Human Rights Commission ("DMHRC"), but he did not let the DMHRC reach a final decision on the matter. *Id.* at *1. Instead, the employee requested a right to sue letter from the DMHRC, which the Des Moines Human Rights Ordinance authorized. *Id.* at *1, *4. The DMHRC issued the right to sue letter, and the employee filed suit. *Id.* at *1–2.

The court looked to the ICRA and drew from prior municipal authority decisions, including *Molitor* and *Cedar Rapids Human Rights Commission,* to conclude it did not have jurisdiction. *Id.* at *3–4. The court stated that if the employee had brought his claim upon judicial review of a final decision, the court would clearly have had authority to hear the violation of the local ordinance based on Iowa Code § 216.19(7). *Id.* at *4. The court concluded, however, that the ICRA did not provide jurisdiction for a district court to hear a violation of a local civil rights ordinance upon administrative release and that "Des Moines does not possess the authority to confer such jurisdiction upon the district court." *Id.* at *4–5.

Based upon a plain reading of the ICRA, the statute does not confer jurisdiction on a local commission to issue a right to sue letter to a complainant for her to bring suit against her employer in state court for violating a local civil rights ordinance. The ICRA provides two avenues to district court. First, Iowa Code § 216.16 provides that a plaintiff may seek an administrative release to take her case to court; this must be done before the ICRC reaches a final decision. Alternatively, Iowa Code § 216.17 provides that if the ICRC retains the complaint, conducts a full investigation, and reaches a final

decision, a party may seek judicial review of the decision in district court.

This is fairly straight forward when the plaintiff is alleging a violation of the ICRA and the case is handled by the ICRC. However, if a local commission is involved, Iowa Code § 216.19, which is titled "Local Laws implementing this chapter," must be consulted. Particularly relevant are Iowa Code § 216.19(7), which discusses local commissions and judicial review, and § 216.19(8), which discusses local commissions and administrative releases.

Iowa Code § 216.19(7) states: "A final decision by a referral agency shall be subject to judicial review as provided in section 216.17 in the same manner and to the same extent as a final decision of the Iowa civil rights commission." Reading this provision in conjunction with § 216.19(1)(c), which states that the ICRA does not prevent a municipality from protecting broader or different categories of discrimination, makes it clear that judicial review is available for violations of not only the ICRA, but also violations of local ordinances. *See Quick,* 2009 WL 7230815, at *4. This is in contrast to the only subsection in Iowa Code § 216.19 that refers to an administrative release, right to sue letter or ability to commence an action in district court; that subsection is Iowa Code § 216.19(8).

Iowa Code § 216.19(8) states: "The referral of a complaint by the Iowa civil rights commission to a referral agency or by a referral agency shall not affect the right of a complainant to commence an action in the district court under section 216.16." The Iowa Supreme Court has not clearly spoken, but a natural interpretation is that a complainant does not lose her

the relevant period did not prohibit discrimination on the basis of sexual orientation. *Id.*

at *3.

right to sue in district court under the ICRA when a referral or a deferral agency handles her investigation and/or resolution of the case. *See supra* pp. 6–9 (discussing *Gray,* 636 N.W.2d at 102). The provision cannot reasonably be read to empower a local commission with authority to issue its own right to sue letters under its local ordinance because the provision explicitly says "commence an action *under Chapter 216.16,*" indicating that the action is for a violation of the ICRA. Iowa Code § 216.19(8) (emphasis added).

This interpretation is consistent with Iowa Supreme Court precedent on municipal authority: *Molitor v. City of Cedar Rapids,* 360 N.W.2d 568 (Iowa 1985); *Cedar Rapids Human Rights Commission v. Cedar Rapids Community School District,* 222 N.W.2d 391 (Iowa 1974); and a factually very similar state court decision, which was upheld on appeal, *Quick v. Emco Enterprises, Inc.,* No. CL 103108, 2009 WL 7230815 (Iowa Dist. Jan. 16, 2009), *aff'd by* No. 09–0311, 2009 WL 5126144, *4 (Iowa Ct.App. Dec. 30, 2009). On the other hand, allowing Plaintiff to proceed on violations of DCRO where she has not fulfilled the statutory requirements of the ICRA would be inconsistent with the ICRA. **Defendant's Motion for Summary Judgment is granted on Counts VII, VIII, and IX.**

■ To summarize, Iowa law does not authorize Plaintiff to initiate a direct action in district court against Defendants for violating the DCRO; to maintain an action under the ICRA, Plaintiff must have received a right to sue letter from the ICRC or, if the ICRC had specifically designated authority to act on the former's behalf, a right to sue letter from the DCRC. There is no evidence the ICRC issued a right to sue letter, nor is there any evidence the ICRC authorized the DCRC to issue a right to sue letter on behalf of the ICRC.

Moreover, the DCRC right to sue letter does not purport to act on behalf of the ICRC. In the absence of a right to sue letter authorizing suit under the ICRA, Plaintiff has not established that she exhausted her administrative remedies. Therefore, the Court may not hear those claims, and Plaintiff may only seek relief under the federal statute: Title VII of the 1964 Civil Rights Act.

## II.

### MERITS OF TITLE VII CLAIMS

■ Only Plaintiff's Title VII claims against Defendant Northwest Mechanical, Inc. remain. Plaintiff's claims against Defendant Schadt are dismissed because Title VII does not allow an employee to be held individually liable. *See McCullough v. Univ. of Arkansas for Med. Scis.,* 559 F.3d 855, 860 n. 2 (8th Cir.2009) (citing *Bonomolo–Hagen v. Clay Cent.-Everly Comty. Sch. Dist.,* 121 F.3d 446, 447 (8th Cir.1997) (per curiam)).

The Court will first describe the facts in the light most favorable to the Plaintiff (*see infra* Part II.A pp. 17–30), then the Court will explain the summary judgment standard (*see infra* Part II.B pp. 30–31). Finally, the Court will analyze each Title VII claim in the following order: Count II: Sexual Harassment (*see infra* Part II.C pp. 31–34); Count I: Disparate Treatment resulting in Discharge (*see infra* Part II.D pp. 35–56); Count III: Retaliation (*see infra* Part II.E pp. 56–60).

### A. Facts

In October 2007, Plaintiff began working for Defendant Northwest Mechanical, Inc., a Plumbing and Pipefitting Contractor that operates on multiple job sites. (Defs.' Statement of Material Facts ¶¶ 1, 6 [15–1] ). Plaintiff's first position with Defendant was as a construction safety assistant

reporting to then Safety Director Stuart Malone. (*Id.* at ¶ 6 [15–1] ). After Malone was terminated, Plaintiff was promoted to the position of Interim Safety Director in October 2008. (*Id.* at ¶¶ 21–22 [15–1] ). Between October 2008 and May 2009, Plaintiff reported to Barry Huber, the former Chief Financial Officer. (*See id.* at ¶¶ 7, 33 [15–1] ). Owner and CEO Greg Hester hired Plaintiff permanently as the Safety Director in May 2009. (*See id.* at ¶¶ 3, 31 [15–1] ). She remained in that position for approximately six months until Hester terminated her on November 19, 2009. (*See id.* at ¶¶ 27–28 [15–1] ). During that period, Plaintiff reported to Hester. (*Id.* at ¶ 33 [15–1] ).

Plaintiff states that over the course of her two years of employment with Defendant she was subjected to a sexually hostile environment.[5] When Plaintiff was a safety assistant splitting her time between two different job sites, John Taylor the foremen on the site wrote on the distributed "daily" sheet, that they needed a "full time safety-person, not a part-time safety lady." (*Id.* at ¶¶ 11–12 [15–1] ). When Plaintiff was the Interim Safety Director, Joe Schadt, the former head of the largest division, advertised to clients that Defendant NWMI was looking for a qualified Safety Director. (*Id.* at ¶¶ 4, 23 [15–1]; Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 20 [20–1] ).

Instances of male job site leaders, such as Pete Strupp and Pat Ryan, yelling at Plaintiff in front of subordinates were recounted. (*See, e.g.,* Defs.' Statement of Material Facts ¶¶ 15, 45 [15–1] ). As a result, subordinates would resist safety instruction from Plaintiff, however, Plaintiff could not recall who specifically refused instruction. (*Id.* at ¶ 15 [15–1] ). In an-

other instance, Plaintiff sent out a report to a large company listserv publicizing a recent safety issue at a job site. Strupp "replied all," challenged Plaintiff's account of the event and stated he had already instituted a new safety policy. He had done so without Plaintiff's input. (*Id.* at ¶¶ 26–28 [15–1]; Pl.'s Resp. to Defs.' Statement of Material Facts ¶¶ 26–28 [20–1] ). In yet another situation, Ryan publicly yelled at Plaintiff while she was investigating a safety issue and said "Go back and work for your mommy and daddy." (Defs.' Statement of Material Facts ¶ 45 [15–1] ).

A job site in Cedar Rapids was a large source of contention. (*Id.* at ¶ 46 [15–1] ). In the month before her termination, Mike Ernat, who was running the Cedar Rapids job site, undermined and disrespected Plaintiff by not involving her in safety decisions, specifically in the hire of safety assistant Darrell Thompson. (*Id.* at ¶¶ 48–49 [15–1] ). Thompson, a union member, was sent by the union on October 13, 2009. (*Id.* at ¶ 48 [15–1] ). It is disputed whether the position had to be filled by a union member and if Defendant was able to choose which union member. (*Compare id.* at ¶¶ 48–49 [15–1] *with* Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 48–49 [20–1] ). Plaintiff had been a safety assistant on a different job site and she was not union. (Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 48 [20–1] ). Defendant has offered no evidence of a contractual obligation to hire a union safety assistant. (*See* Defs.' Statement of Material Facts ¶¶ 46–48 [15–1] ).

Additionally, Plaintiff states that there were pre-job meetings conducted and safety decisions made that she would not find

---

5. The Court has not included an exhaustive recitation of Plaintiff's extensive complaints but has attempted an accurate representation.

out about until days later; she did not provide specific examples. (*Compare id.* at ¶ 49 [15–1] *with* Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 49 [20–1]; *see* Pl.'s App. 62–63, Toppert's Dep. 139–43 [20–5]).

Plaintiff states that Thompson was unqualified for the job and allegations floated, which Plaintiff denies, that she treated Thompson disrespectfully. (*Compare* Defs.' Statement of Material Facts ¶ 50 [15–1] *with* Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 50 [20–1]). In late October 2009, Ernat and Schadt restricted Plaintiff from going to the "job site unless she was with Mike Solbrig or Todd Engler because of issues concerning Thompson." (*Compare* Defs.' Statement of Material Facts ¶ 51 [15–1] *with* Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 51 [20–1]).

In addition to Ernat leaving her out of meetings, Plaintiff complained Schadt did not tell her about meetings until the last minute, arrived late to meetings, and cancelled meetings. (*See* Defs.' Statement of Material Facts ¶ 134 [15–1] ("Techau is not aware of any meetings Schadt delayed or cancelled other than the November 6, 2009, meeting. Any meeting Toppert attended with Schadt would have involved other people.") (citing Defs.' App. 64, Toppert Dep. 45 [15–3]; Defs.' App. 144, Techau Dep. 55–56 [15–5]); Pl.'s App. 81–82, Toppert's Dep. 124–27 [20–6]). When describing meeting problems with Schadt, Plaintiff is including issues she had with Schadt's subordinates. (Pl.'s App. 81–82, Toppert's Dep. 124–27 [20–6]). She attributes difficulties with Schadt's subordinates to Schadt because, she states, he is responsible for their actions. (*Id.* [20–6]).

Plaintiff was particularly troubled when Schadt attended a dinner with a job site manager and a project manager in Blair, Nebraska, but Plaintiff was not invited, even though she was in town. (Pl.'s Statement of Material Facts ¶ 76 [20–2] (citing Pl.'s App. 58, Toppert Dep. 122–23 [20–5])). Because of the people at the dinner, Plaintiff assumes work was discussed. (Pl.'s App. 60, Toppert's Dep. 127–29 [20–7]). If she had been at the meeting, Plaintiff assumes she would have gained information that would have allowed her to finish earlier at the site. (*See id.* [20–6]).

Plaintiff stated that Schadt would walk past her desk and stare at her for about a minute and not talk to her, which made her feel uncomfortable. (*Compare* Pl.'s Statement of Material Facts ¶ 77 [20–2] (citing Pl.'s App. 61, Toppert Dep. 130 [20–5]) *with* Defs.' Reply to Pl.'s Statement of Material Facts ¶ 77 [21]; Pl.'s App. 61, Toppert Dep. 130–32 [20–5]). Plaintiff could not say exactly how many times this occurred, but she testified it occurred several times. (Pl.'s App. 61, Toppert Dep. 130–32 [20–5]).

Plaintiff contends she was treated poorly by her coworkers because she was a strong and assertive female. (*Compare* Defs.' Statement of Material Facts ¶¶ 29, 41, 117, 141, 143 [15–1] *with* Pl.'s Resp. to Defs.' Statement of Material Facts ¶¶ 29, 41, 117, 141, 143 [20–1]). Defendant responds that Plaintiff was simply failing to do her job in the manner prescribed, which included going through the proper chain of command. (*Compare, e.g.,* Defs.' Statement of Material Facts ¶ 40 [15–1] *with* Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 40 [20–1]).

While she was a safety assistant, Plaintiff asked Malone how to do her job differently so as not to anger people. (Defs.' App. 217 [15–7]). In October 2009, after Plaintiff sent an email which upset her coworkers, Hester explained how she could word future emails so as to prevent the backlash. (Defs.' Statement of Material Facts ¶¶ 52–53 [15–1]).

According to Plaintiff, rumors also circulated through the company that Plaintiff was promiscuous and had shown other employees a photo on her phone of her naked breasts. (*Id.* at ¶¶ 17, 102 [15–1]). Plaintiff reported Strupp as one individual she heard (through Ed Mesick, a union employee) had commented on her promiscuity. (*Id. at* ¶¶ 17–18 [15–1]). She reported it to Hester. (*Id.* [15–1]).

Plaintiff contends that the resistance she received in the field was accompanied by structural inequities ranging from lower pay than her male predecessor and male successor, to not being provided the same benefits as men, such as hotel rooms mileage reimbursement, an office, conference attendance, a company car, and a smart phone. (*See generally id.* at ¶¶ 145–68, 174–79 [15–1]; Pl.'s Resp. to Defs.' Statement of Material Facts ¶¶ 145–58, 174–79 [20–1]). Plaintiff also was not invited by her coworkers to engage in social activities, such as golfing and meals. (*See generally* Defs.' Statement of Material Facts ¶¶ 169–73 [15–1]; Pl.'s Resp. to Defs.' Statement of Material Facts ¶¶ 169–73 [20–1]).

From Plaintiff's perspective, although she encountered resistance in the field and did not receive all of the benefits men did, she felt that her employment was safe until November 6, 2009. Prior to then, Defendant never conducted a formal performance evaluation of her. (*Compare* Pl.'s Statement of Material Facts ¶¶ 14–16 [20–2] *with* Defs.' Reply to Pl.'s Statement of Material Facts ¶¶ 14–16 [21] (the Court understands the parties agree on this point but disagree whether the November 6, 2009 meeting should be considered when Plaintiff says she "never" received an evaluation)).

Plaintiff worked with different job site managers. On November 5, 2006, Hester emailed Plaintiff and the job site leaders, telling them to set up monthly meetings (and twice per month meetings with Schadt's division) "to review the direction of the safety program." (Defs.' Statement of Material Facts ¶ 70 [15–1]). Plaintiff set up meetings with all of the leaders for the following morning on November 6; Schadt rescheduled his meeting for the afternoon of November 6. (*Id.* at ¶ 74 [15–1]). Prior to the meeting, Schadt discussed with Hester concerns he had with Plaintiff's performance. (*Id.* at ¶ 70 [15–1]). Hester gave Schadt permission to discuss those issues with Plaintiff, but Hester did not intend for Schadt to issue Plaintiff a "notice to cure." (*Id.* at ¶ 71 [15–1]).

When Schadt brought up the issue of her performance at the meeting, Plaintiff was caught off-guard; she did not understand that to be the purpose of the meeting or within Schadt's responsibilities because she reported to Hester, not Schadt. (*Id.* at ¶¶ 72, 75, 83 [15–1]). The meeting did not go as either Schadt or Plaintiff hoped or expected. (*Id.* at ¶¶ 78, 84 [15–1]). Schadt criticized Plaintiff's job performance and behavior on sites, specifically spending too little time doing safety audits and too much time talking and flirting with contractors. (*Id.* at ¶ 81 [15–1]; Pl.'s Statement of Material Facts ¶ 24 [20–2]). Schadt also told her to not be so confrontational. (Defs.' Reply to Pl.'s Statement of Material Facts ¶ 63 [21]). Plaintiff challenged every allegation. (Defs.' Statement of Material Facts ¶ 83 [15–1]). Schadt left the meeting disappointed in Plaintiff's reaction to criticism, and Plaintiff left the meeting feeling personally and professionally attacked. (*Id.* at ¶¶ 75, 78, 83 [15–1]; Defs.' App. 172 [15–6]). Because she was greatly distraught, Plaintiff called her friend and colleague Vicki Techau, who suggested she tell Hester. (Pl.'s State-

ment of Material Facts at ¶¶ 31, 33 [20–2]).

Because Hester was out of town at a conference, Plaintiff emailed him. (*See* Defs.' App. 172 [15–6]) (providing the full email). She told him that Schadt conducted a performance review of her, and Schadt stated it was a "job warning" and that "he had Greg's blessing to address these matters." (*Id.* [15–6]). Plaintiff told Hester that she refuted Schadt's allegations, and she described specific allegations which she said were "baseless." (*Id.* [15–6]). In the email, Plaintiff lodged an internal complaint against Schadt for violating the company bullying policy. (*Id.* [15–6]; Defs.' Statement of Material Facts ¶ 84 [15–1]). She described Schadt's conduct as harassing, but she did not allege that the harassment was based on her gender. (*See* Defs.' App. 172 [15–6]; Defs.' Statement of Material Facts ¶ 84 [15–1]). Plaintiff did not say she thought Schadt's behavior was in violation of sexual harassment policy or law. (Defs.' App. 172 [15–6]; Defs.' Statement of Material Facts ¶ 84 [15–1]). Although Defendant had a sexual harassment policy, Plaintiff had not received training on it, and she had not received a physical copy of it. (Defs.' Statement of Material Facts ¶ 84 [15–1]). A sexual harassment policy was included in a company manual that was uploaded to the company "intranet." (*Id.* at ¶ 85 [15–1]). Approximately a month before the incident, Defendant emailed employees, told them the updated manual was available on the intranet, and encouraged employees to read it. (*Id.* at ¶ 86 [15–1] (citing Defs.' App. 219, Email from Hester to Employees Oct. 5, 2009 re Employee Handbook [15–7]; Defs.' App. 186–87, Dep. Ex. 19 Oct. 2009, Employee Handbook Sexual Harassment Policy [15–6])).

Hester received Plaintiff's email and took immediate action to have Huber begin an investigation. (*Id.* at ¶ 88 [15–1]). On November 7, Hester responded to Plaintiff and told her Huber would investigate and she should stay in the office while he does so. (*Id.* at ¶ 89 [15–1]). Plaintiff replied to Hester stating she would be meeting with Huber on Monday, November 9 and then would be taking vacation from Wednesday, November 11 through Tuesday, November 17. (*Id.* at ¶ 90 [15–1]). Hester also asked Schadt to gather documentation in support of Schadt's conversation with Plaintiff about performance issues. (*Id.* at ¶ 91 [15–1]). Thus, Plaintiff's complaint sparked two investigations: 1) an investigation into the meeting between Schadt and Plaintiff to determine if he bullied her and 2) an investigation into Plaintiff's work performance.

Huber conducted the investigation with office manager Kim Erps. (*Id.* at ¶ 92 [15–1]). Huber understood his duties to be to determine if Schadt violated the bullying policy and ascertain if Plaintiff believed Schadt violated another policy, specifically the sexual harassment policy. (*See id.* at ¶ 93 [15–1]). She confirmed that she thought Schadt violated the bullying policy. (*Id.* at ¶ 93 [15–1]). Huber never asked if Plaintiff thought Schadt violated a sexual harassment policy. (*Id.* [15–1]). Huber and Erps concluded that Plaintiff was alleging that Schadt's behavior was bullying but Schadt did not bully her. (*Id.* at ¶ 97 [15–1]). Huber reported the findings to Hester, including his and Erps' notes. (*Id.* at ¶ 96 [15–1]). Plaintiff thought the investigation should have been conducted by Hester because she reported to Hester and also by Vicki Techau because Techau worked in Human Resources(though she did not have the ability to hire or fire). (*Id.* at ¶ 94 [15–1]).

Schadt compiled supporting materials by "contact[ing] Ernat and request[ing] reports on Toppert's performance and Ernat

[getting] the information from the people under him, which included Lamb, Solbrig, Engler, and Luethye. Schadt also asked other people under his control to provide information, which included Derrick Workman, Dan VanVooren, Bill Stropes, and Dan Ryan." (*Id.* at ¶ 101 [15–1] ). The reports generally supported Schadt's performance evaluation. They describe Plaintiff as a person who does not fulfill her job duties; does not spend enough time inspecting sites, socializes in lieu of working, and does not have the respect of her colleagues. (*See* Defs.' App. 175–82, Supervisor Summaries [15–6] ). One specific issue stood out for Hester and Schadt. In his email to Hester with the reviews, Schadt included an email he received from Don Lamb by way of Mike Ernat.

> While the Safety Director was there the last week on Tuesday or Wednesday I noticed a huddle around [Plaintiff's] computer at the other end of the trailer and I thought this is not good they are supposed to be working, I walk to the other end of the trailer to find [Plaintiff], James League, James Brestel and Gary Davis looking at the computer going over background checks and arrest records of some of Northwest's employees, as I am about to break it up I hear her say look at this one 14 arrests and one of the them is a felony, Vicki must never look at these.

(*Id.* at 175 [15–6]; *see also id.* at 231 [15–7] ). Schadt, who is not a lawyer, added the following commentary: "Legal: Ali has been on a job site showing Northwest employees arrest reports she was pulling off of a search site. This is setting us up for potential legal damage." (*Id.* at 182 [15–6]; Defs.' Statement of Material Facts ¶ 114 [15–1] ).

Hester assumed that Plaintiff had accessed the background checks that the company conducted of employees with their permission for the limited purpose of gaining access to construction sites. (Defs.' Statement of Material Facts ¶¶ 122–23 [15–1] ). Hester assumed that the information was not publicly available and that Plaintiff gained the information from the Defendant's database, to which he and Huber assumed Plaintiff had password access. (*Id.* [15–1] ). Hester did not investigate this issue further. (Pl.'s Statement of Material Facts ¶ 52 [20–2] ).

On November 19, 2009, Hester called a meeting with Plaintiff and told her that she was being terminated for violating privacy laws. (*Compare* Defs.' Statement of Material Facts ¶ 127 [15–1] *with* Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 127 [20–1] (disagreeing whether Hester verbalized the reason of poor performance)). Hester also handed Plaintiff an envelope containing a letter stating Plaintiff was being terminated for violating privacy laws and poor performance. (*Compare* Defs.' Statement of Material Facts ¶ 127 [15–1] *with* Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 127 [20–1] ). Defendant has said that "Hester would not have terminated Plaintiff but for his belief Toppert violated employee privacy rights." (Defs.' Statement of Material Facts ¶ 124 [15–1] ). This seems accurate in light of his deposition testimony which suggests that ordinarily Plaintiff would have been given notice of her performance deficiencies and the opportunity to cure them. (*See* Defs.' App. 26, 34, Hester Dep. 20, 74–76 [15–2] ).

Hester did not allow Plaintiff to respond to the allegations prior to terminating her. (Pl.'s Statement of Material Facts ¶ 52 [20–2]; Pl.'s Resist. 13 [20] ). After consulting with counsel, Hester knows that Plaintiff did not violate privacy laws. (*Compare* Pl.'s Statement of Material Facts ¶ 53 [20–2] *with* Defs.' Reply to Pl.'s Statement of Material Facts ¶ 53 [21] ).

## B. Summary Judgment Standard

Summary judgment is appropriate if the moving party establishes that there are no genuine disputes over any material fact, and it is entitled to judgment as a matter of law. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 467 (8th Cir.2011) (citing Fed. R.Civ.P. 56(a)). A "genuine" dispute is one that has a "real basis in the record." *See Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A material fact is a fact that "might affect the outcome of the suit under governing law." *See id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Teleconnect Co. v. Ensrud*, 55 F.3d 357, 359 (8th Cir. 1995) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The court must view all facts and reasonable inferences in the light most favorable to the non-moving party, but it does not resort to speculation. *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 727 (8th Cir.2008) (citing *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir.2007)). The non-moving party must provide sufficient evidence to allow a rational jury to find in her favor. *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir.2013) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.2011)). The non-moving party must "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999) (citing Fed.R.Civ.P. 56(e)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Webb v. Lawrence Cnty.*, 144 F.3d 1131, 1135 (8th Cir.1998).

## C. Sexual Harassment

Plaintiff states that she was subjected to a hostile work environment when she was sexually harassed in violation of Title VII of the 1964 Civil Rights Act. In order to establish a prima facie case of sexual harassment, Plaintiff must show " '(1) that [she] is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition or privilege of her employment.' " *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858, 862 (8th Cir.2009) (quoting *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1026 (8th Cir.2004)).

For the purpose of the summary judgment motion, Defendant does not challenge the first and second prong. (*See* Defs.' Br. in Support of Summ. J. 25 [17] ). Defendant disputes the third and fourth prongs, arguing Plaintiff cannot establish the harassment was based on sex or that the harassment affected a term, condition or privilege of her employment. It is only necessary here to examine the fourth prong for it is clear under Eighth Circuit precedent any harassment which may have occurred did not have the requisite effect on Plaintiff's employment.

To prove that alleged harassment affected a term, condition, or privilege of employment a plaintiff must produce sufficient evidence to establish that the environment was objectively and subjectively offensive. *See Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858, 862 (8th Cir.2009) (citing *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir.2004)). In reaching that decision, the Court will weigh the following factors 1) the frequency of the conduct, 2) the severity of the conduct, 3) whether the conduct was physically threatening or humiliating as opposed to just offensive

speech, and 4) whether it was so severe or pervasive that it unreasonably interfered with the employee's work performance.[6] *See id.*

Plaintiff cannot establish that the conduct was objectively offensive enough to affect the terms or conditions of her employment. This is not a close case. The threshold is high: Plaintiff must establish that the work environment was "poisoned" by sexual harassment. *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 967 (8th Cir. 1999) (quoting *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210, 214 (7th Cir.1986)).

Plaintiff's complaints are of a frustrating and unrewarding workplace: of a workplace where she was not liked or respected; people criticized her performance and work ethic; were reluctant to take direction from her; and occasional comments had been made by her evaluators that she was promiscuous. She was not, however, the target of sexual advances, subjected to comments about her body, touched, or physically humiliated. The sexual comments were in the nature of rumors, of which Plaintiff was aware. They were not addressed to her. In the main, Plaintiff's complaints are about what she perceived to be unfair and false criticisms of her work, the manner in which they were presented to her, and being left out of decisions in which she thought she should be involved.

The Eighth Circuit has decided cases that include conduct similar to the conduct Plaintiff describes. In *Ottman v. City of Independence,* the Eighth Circuit held that the "district court erred in finding a triable issue on the plaintiff's sexual harassment claims where the harassing conduct con-

sisted of belittling and sexist remarks on an almost daily basis." *Graves v. City of Durant,* No. C09–0061, 2010 WL 785850, at *11 (N.D.Iowa Mar. 5, 2010) (citing *Ottman,* 341 F.3d 751, 760 (8th Cir.2003)). In *Devin v. Schwan's Home Service, Inc.,* the court held that "[a]s for her claims she was denied a Route Builder, was unfairly disciplined, was paid less than male RMs, was not allowed to expense pay phone calls, and was required to make inventory changes on the computer, they at best amount to a frustrating work environment rather than an objectively hostile environment." 491 F.3d 778, 788 (8th Cir.2007). In *Bradley v. Widnall,* the court stated that where Plaintiff "alleges that her supervisory duties were curtailed, that she was left out of the decision-making process, treated with disrespect, and subjected to false complaints .... [it] may have resulted in a frustrated work situation, [but] we do not believe that it was so severe or pervasive, as to have altered the terms or conditions of employment." 232 F.3d 626, 631–32 (8th Cir.2000). Similarly, in *Breeding v. Arthur J. Gallagher & Co.,* the court stated "[Plaintiff] felt she was unfairly criticized and often yelled at, but these conditions, while not desirable, do not amount to actionable harassment on the basis of age." 164 F.3d 1151, 1159 (8th Cir.1999). Again, in *Hannoon v. Fawn Engineering Corp.,* the court held that when an employer complained about Plaintiff's body odor and work performance, the employer was criticizing, not harassing the employee. 324 F.3d 1041, 1047–48 (8th Cir.2003).

As in these cases, Plaintiff has not presented sufficient evidence to take the conduct of which she complains beyond an

---

**6.** The Court notes that it does not consider Plaintiff's allegations of harassment that are based on the performance evaluations collected by Schadt. Plaintiff had no knowledge of these statements during the course of her employment. Accordingly, those comments cannot produce a hostile work environment.

unhappy and frustrating work environment to the severity and pervasiveness which would permit a finding that it unreasonably interfered with her work performance. **Defendant's Motion for Summary Judgment on Count II is granted.**

### D. Discriminatory Discharge [7]

When opposing a motion for summary judgment on a claim of disparate treatment in violation of Title VII, a plaintiff may choose from two analytical paths. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir.2004). A plaintiff will survive summary judgment if she has direct evidence of discrimination " 'showing a specific link between the alleged discriminatory animus and the challenged decision [that is] sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Id.* (*quoting Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir.1997)). Direct evidence is interpreted as "strong" evidence, which may consist of circumstantial evidence. *Id.* Without direct evidence of discrimination, a plaintiff will survive summary judgment, if she can establish an inference of discrimination using the three-part *McDonnell Douglas* burden-shifting framework. *Id.* (citing *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 971 (8th Cir.1994) (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973))).

#### 1. Indirect Evidence Standard

■ Here, Plaintiff does not assert direct evidence of discrimination; she has analyzed her discharge claim under the *McDonnell Douglas* framework.[8] (Pl.'s Resist. 8 [20] ). First, the plaintiff has the burden of establishing a prima facie case. In a discharge case, the plaintiff must show that 1) she is a member of a protected class, 2) she was meeting her employer's legitimate expectations 3) she

---

**7.** Count I alleges discriminatory discharge and also refers to disparate treatment in unspecified terms, conditions, and privileges of employment. Defendant has interpreted Plaintiff's allegations of lack of mileage reimbursement, hotel costs, pay differences, etcetera as put forward to support the determination of pretext and not as a separate claim. (Defs.' Br. in Supp. of Mot. for Summary J. 16[15] ) Plaintiff does address these issues in her response to Defendant's Statement of Facts, but Plaintiff does not address them or provide any legal argument in her Resistance to the Motion for Summary Judgment. In its Reply, Defendant points out that "Toppert does not respond to NWMI's arguments on these claims." (Defs.' Reply 5–6 [22] ). The Court views Count I solely as a claim for discriminatory discharge.

**8.** Plaintiff has argued that Defendant may be liable for discrimination not because Hester discriminated her but because the *de facto* decisionmaker, Schadt, discriminated against her. Plaintiff is invoking cat's paw liability, which she correctly notes is recognized by the Eighth Circuit in Title VII cases. (Pl.'s Resist. 13 [20] (citing *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009))). However, as Defendant points out, the Eighth Circuit has only discussed cat's paw liability in the context of direct evidence cases. (*See Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1152 (8th Cir.2011) ("Our cat's paw cases involve what our Court calls direct-evidence claims, e.g., *Qamhiyah*, 566 F.3d at 742; *Richardson* [*v. Sugg* ], 448 F.3d [1046,] 1059–60 (8th Cir.2006), not claims pursued through the *McDonnell Douglas* burden-shifting framework")). However, the Eighth Circuit has not definitively and explicitly ruled on whether cat's paw liability may be applied to indirect evidence cases. *See Diaz*, 643 F.3d at 1152 (declining to resolve whether a plaintiff may proceed on a cat's paw theory without direct evidence). Plaintiff has not argued for the expansion of cat's paw liability. Similar to *Diaz*, the Court does not need to resolve this question because the parties have fully briefed the alleged discriminatory discharge using the indirect evidence standard, and the Court finds that Plaintiff has established sufficient evidence of pretext.

was discharged, and 4) the circumstances surrounding the discharge create an inference of discrimination. *Riser v. Target Corp.*, 458 F.3d 817, 820 (8th Cir.2006) (citing *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 478 (8th Cir.2004)); *Richardson*, 448 F.3d at 1060 (citing *Davis v. KARK–TV, Inc.*, 421 F.3d 699, 704 (8th Cir.2005)). By establishing the prima facie case, a presumption of discrimination is created. *Richardson*, 448 F.3d at 1060 (citing *Davis*, 421 F.3d at 704).

The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for discharge. *Id.* (quoting *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir.1994)). This burden " 'is not onerous and the explanation need not be demonstrated by a preponderance of the evidence.' " *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir.2011) (*en banc*) (quoting *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir.1999)). At that point, the presumption of discrimination disappears, and the plaintiff has the ultimate burden to present evidence sufficient to generate a genuine issue of material fact about whether the proffered legitimate reason is a pretext for intentional discrimination. *Id.* at 1046–47 (citing *Pope v. ESA Servs. Inc.*, 406 F.3d 1001, 1007 (8th Cir.2005)). If the defendant offers more than one legitimate, non-discriminatory reason, the plaintiff is only required to establish that one reason is pretext for discrimination. *See McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860–61 (8th Cir.2009) ("At the summary judgment stage under the 1991 amendments to Title VII, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action. If so, then the presence of additional legitimate motives will not entitle the defendant to summary judgment.") (internal quota-

tions omitted) (citing *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir.2008)).

Where a defendant has proffered a legitimate, non-discriminatory reason for the termination, the court may move past the prima facie analysis directly to the ultimate question of whether the plaintiff can persuade the court that the reason is actually pretext for discrimination. *See, e.g., Weesner v. U.S. Bancorp*, No. 10–2164 (RHK/LIB), 2011 WL 4471765, at *9 (D.Minn. Sept. 26, 2011); *see also McCullough*, 559 F.3d at 861 (*citing Riser*, 458 F.3d at 821; *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)). In light of Defendant's proffer of a legitimate non-discriminatory reason, neither party has addressed whether Plaintiff is able to establish a prima facie case. The Court also will bypass the prima facie stage and proceed to the pretext stage.

Defendant has articulated two legitimate, nondiscriminatory reasons for termination: 1) Plaintiff violated privacy laws by accessing the results of employees' company-initiated background checks and sharing the information with other employees and 2) Plaintiff's work performance was poor. These general allegations were made from the termination date as evidenced in the letter that stated: "Because of your violation of privacy laws and because of failure to adequately perform your duties as Safety Director we have decided to terminate your employment effective immediately." (*See* Defs.' App. 184, Termination Letter [15–6] ). As indicated previously, it is evident that the primary, indeed but for, reason given by Defendant was the privacy law violation. This satisfies Defendant's burden to articulate a legitimate, non-discriminatory reason. Any presumption of discrimination has fallen away and Plaintiff must produce sufficient evidence that at least one of these reasons was mere pretext for dis-

crimination. At the summary judgment stage, Plaintiff "must point to enough admissible evidence to raise genuine doubt as to the legitimacy of defendant's motive, even if that evidence [does] not directly contradict or disprove defendant's articulated reasons for its actions." *Wierman v. Casey's General Stores,* 638 F.3d 984, 995 (8th Cir.2011) (quoting *Strate v. Midwest Bankcentre, Inc.,* 398 F.3d 1011, 1021 (8th Cir.2005) (internal quotation marks omitted) (emphasis omitted)).

### 2. Reason No. 1: Violating Privacy Laws

Plaintiff offers three main arguments to establish Defendant's reason of violating privacy laws is pretext. First, Plaintiff says Defendant's reasons changed over time to include not only violation of privacy laws, but also poor performance. Both reasons were based on inaccurate evidence, she says, but the privacy law violation "defies common sense" because it requires the Court to accept Defendant's premise that it thought she was using the company's password-protected database and not viewing public court records. Second, Plaintiff alleges the nature of the investigation into her performance was suspect because it was launched in response to her harassment complaint; it was headed by the person she accused of harassment; and she was not given an opportunity to explain herself. Third, Plaintiff argues that not terminating Strupp for violating privacy laws indicates that similarly situated men are not disciplined as harshly.

The Court addresses these arguments but in a slightly different organizational fashion.

### a. Has Defendant changed its reasons for termination and does that provide pretext?

██ Plaintiff argues that Defendant's sole original reason for termination was that she violated privacy law—Defendant only later added on the reason of poor performance. Plaintiff has argued that Defendant changed its reason for termination, and this change supports a finding of pretext. (Pl.'s Resist. 10 [20] (citing *Morris v. City of Chillicothe,* 512 F.3d 1013, 1019 (8th Cir.2008))). However, this argument simply does not fit the facts. Hester met with Plaintiff, orally explained why she was being terminated *and* handed her a termination letter. (*See* Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 127 [20–1] ). Even if his oral presentation only referred to termination for violating privacy laws, it is undisputed he also gave her a termination letter, which stated both reasons: violation of privacy laws and inadequate performance. (*See* Defs.' Statement of Material Facts ¶ 127 [15–1] (citing Defs.' App. 184, Termination Letter [15–6] )). The privacy law violation was the main, determinative reason and hence the appropriate focus of the pretext inquiry, but poor performance has consistently been present as a secondary reason. The "changing reasons" argument is a nonstarter.

██ An inference of discrimination is not raised when an employer emphasizes one reason for termination. Nor does Defendant's realization and admission that Plaintiff did not violate privacy laws constitute a change in reason. This is not akin to *Jones v. National American University,* where the employer argued to the EEOC that the Plaintiff's performance was deficient, but at the trial argued and presented evidence that her lack of management and marketing skills prevented her from getting the promotion. 608 F.3d 1039, 1047 (8th Cir.2010). Plaintiff's situation is more similar to *Smith v. Allen Health Systems, Inc.,* where plaintiff

Smith stated that defendant "Allen originally said it was discharging her for failing to get the receipts out, but that CEO Seidler later added the suggestion that Smith was fired for concealing from Justis how far behind she really was when he talked to her [a month earlier]." 302 F.3d 827, 835 (8th Cir.2002). The court held that the employer "certainly did not back off from the original explanation, but only pointed out an additional aspect of the same behavior. [The employer's] testimony is not different from the reason originally given, but only a slight elaboration of that reason. It is not a substantial change in [the employer's] story, and it is not probative of pretext." *Id.*

b. Was Hester's belief that Plaintiff violated privacy laws honest and was the investigation conducted fairly and in good faith?

Next, Plaintiff states that the Court should find that Defendant's reason of violation of privacy laws is unworthy of credence. Plaintiff maintains that it is simply not believable that Defendant thought she was accessing the password-protected database that holds company-requested background checks because she did not have the password to that database. (*See* Pl.'s Resist. 10–11 [20] ). In actuality, she was on a public database, assisting another employee in informally investigating a theft of company property.

In and of itself, it does not "def[y] common sense," as Plaintiff alleges, to believe that an employer would be unaware criminal court records are available online and anyone may access them. It is not reasonable to assume this knowledge is so wide-spread that unawareness cannot be believed. However, Plaintiff does have a point as to the effect of the lack of investigation of the privacy law violation on the claim that Defendant in good faith believed the violation had occurred.

i. Law

The Court must consider whether Hester honestly believed that Plaintiff 1) accessed the company database, 2) was discussing employees' arrest records with other employees, and 3) as a result, was violating privacy laws. In *Richey v. City of Independence*, the Eighth Circuit stated:

> The normal rule in discrimination cases is that if an employer honestly believes that an employee is terminated for misconduct, but it turns out later that the employer was mistaken about whether the employee violated a workplace rule, the employer cannot be liable for discrimination. *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 637 (8th Cir.2000). If the employer takes an adverse action based on a *good faith* belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity. "The relevant inquiry is whether the [employer] *believed* [the employee] was guilty of conduct justifying discharge." *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir.2000) (internal quotation omitted).

540 F.3d 779, 784 (8th Cir.2008) (emphasis added to "good faith").[9] In other words, "it is not enough to prove that the employer's justification was unfounded, the employee actually has to adduce evidence that

---

**9.** Plaintiff's focus on 1) her business reason for searching criminal records, albeit through a public forum, and 2) not actually violating privacy laws is misplaced. *Chivers v. Wal–Mart Stores, Inc.*, 641 F.3d 927, 934 (8th Cir.2011) (citing *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 416 (8th Cir. 2010)). The issue is whether Hester honestly believed that she violated privacy laws, not whether she actually violated privacy laws or did something to deserve punishment. *Id.* (citing *Richey*, 540 F.3d at 784).

the employer knew (or perhaps should have known) the justification was unfounded." *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 n. 4 (8th Cir.2001).

The question of whether Defendant's belief was honest cannot be separated from the question of whether the investigation was conducted in good faith. As such, the Court continues with the discussion of the honest belief rule and delves more deeply into the law on when a deficient investigation can establish pretext for discrimination.

An employer is free to exercise its business judgment in personnel decisions, including not only its ultimate decision, but also the process for reaching the decision, so long as it does not discriminate on the basis of a protected status or because the person engaged in a protected activity. The Eighth Circuit has stated: "We do not sit as [a] super-personnel department[ ] reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination or unlawful retaliation." *Chivers*, 641 F.3d at 934 (quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 883 (8th Cir.2005)); *see also McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009).

The way in which an employer conducts a decisionmaking process may give rise to an inference of discrimination, giving an employee the right to proceed to trial. The general rule is that "[t]he appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." *McCullough*, 559 F.3d at 863 (citing *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 859 (8th Cir.2004)). Certain shortcomings may suggest that the investigation was so limited it is unlikely it was conducted in good faith.

A plaintiff may try to demonstrate that her employer lacked good faith when it internally investigated her allegations of discrimination against another employee or when it internally investigated the plaintiff for misconduct by showing that the employer decided her version of the event was untrue or less likely to be true than a competing version of the story. The Eighth Circuit has held that an employer can weigh the statements of different witnesses against the plaintiff's statements, find plaintiff to be less credible, and if there is no evidence to suggest otherwise, it will not raise an inference of discrimination or negate a finding of good faith in an honest belief decision, particularly when that decision is independently corroborated. *See, e.g., id.* .at 865; *Richey*, 540 F.3d at 785. The court has stressed that " '[a]n internal investigation, like a judicial proceeding, often produces conflicting evidence and requires judgments about credibility and the weight to be given various pieces of information.' " *Alvarez*, 626 F.3d at 417. That an employer is selective in its investigation does not permit an inference of discrimination without evidence that "investigators purposely ignored relevant information or otherwise truncated the inquiry because of bias...." *McCullough*, 559 F.3d at 863. "The focus is on whether [the employer's] investigation prevented [it] from making a 'reasonably informed and considered decision' prior to terminating [plaintiff]." *See Chivers*, 641 F.3d at 934–35 n. 6 (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir.1998)).

In *Wierman v. Casey's General Stores*, the Eighth Circuit held that an employer does not have to provide an employee the opportunity to respond to allegations. 638 F.3d 984, 996–97 (8th Cir.2011). However, the court's holding was dependent upon the allegations being corroborated by independent evidence. It was the convenience

store's policy that an employee must purchase merchandise before consuming it and must keep the receipt of the purchase in the shift-audit envelope. *Id.* at 991. Defendant had videotape surveillance of the employee consuming the product, failing to pay for it before consuming it, and the employer did not find a receipt in the shift-audit envelope. *Id. at* 997. In such a scenario where there was independent corroboration, no inference of discrimination arises because the plaintiff would not have been able to refute the violation of the policy—it was recorded. *See id.* ("This evidence confirms a good-faith basis for Wierman's termination, and any failure to conduct a more searching inquiry is not evidence of pretext.").

This Court cannot find Eighth Circuit precedent on whether an inference of discrimination may arise where employee misconduct is alleged, the facts known to the employer are not compelling or inconclusive, and prior to termination the employer did not allow the employee to respond to the allegations.

Plaintiff provided only one case, *Mastro v. Potomac Electrical Power Co.*, to support her argument that an inference of discrimination should arise because Defendant did not give her the opportunity to respond to allegations of violating privacy laws. 447 F.3d 843, 853–56 (D.C.Cir.2006). Plaintiff Mastro, a white man, was a supervisor for the defendant. *Id.* at 847. An incident arose when the plaintiff's subordinate Donald Harsley, a black man, was arrested over the weekend, held in jail and unable to come to work on Tuesday after the holiday weekend. *Id.* at 847. On Thursday of the same week, the plaintiff reported to his supervisor that Harsley was using the vacation days because he was in jail. *Id.* at 848. Defendant intended to terminate Harsley for not promptly informing his employer that he was in jail.

*Id.* Harsley then alleged that he told plaintiff on Monday he was in jail. *Id.* Plaintiff refuted Harsley's claim. *Id.* Plaintiff said he did not know until Wednesday afternoon or Thursday morning that Harsley was in jail when he was prompted (by rumors) to ask Harsley when he spoke to him on the phone. *Id.* An investigation ensued to determine who was lying. *Id.* The plaintiff's second in command James Bryant, a black man who had a record of interpersonal conflicts with the plaintiff, supported Harsley's version of the events. *Id.* at 848, 855. A third person, Jose Smith, confirmed Harsley's version of the events. *Id.* at 848. Only after the investigation report was completed (concluding the plaintiff was the liar) and presented to management, was the plaintiff allowed to give his version of the story. *Id.* at 855.

The D.C. Circuit Court found that the investigation was "not just flawed, but inexplicably unfair" and that "sufficient evidence exists for a jury to conclude ... that discriminatory treatment may have permeated the investigation itself." *Id.* at 855, 856. Two aspects of the ruling are particularly relevant. First, "[f]or Duarte to have spoken to everyone in the normal course of investigation except the individual at the center of the controversy—and the only Caucasian—might well strike a jury as odd." *Id.* at 855. Second, "the investigation ... lacked the careful, systematic assessments of credibility one would expect in an inquiry on which an employee's reputation and livelihood depended...." *Id.* Specifically, the court was particularly concerned about the defendant's failure to assess the credibility of "the individual whose account proved most central to determining Mastro's fate," referring to the individual who stood to gain the plaintiff's job and had previously physically assaulted the plaintiff. *Id.* at 856.

#### ii. Application

Plaintiff alleges that Defendant's investigation into her performance raises an inference of discrimination because 1) it was launched after she accused Schadt of harassment; 2) Schadt led the investigation; and 3) she was not given an opportunity to respond to the allegations, specifically the allegation that she violated privacy laws. The Court considers whether Defendant's asserted belief that Plaintiff violated privacy laws was honest and whether the investigation was conducted fairly and in good faith. The questions are intertwined.

▉ Plaintiff argues that this timing is odd: that only after she reported Schadt for harassment did Hester launch an investigation into her performance. Nevertheless, this is not supported by the reality that the "harassment" occurred during the course of a, perhaps ill-timed, ill-advised, and ill-administered, performance evaluation.[10] It was reasonable for Hester to ask Schadt to put together supporting documents for the issues he discussed in the meeting; whether the issues in the performance evaluation were supported would be important in determining if Schadt's critiques constituted bullying. Plaintiff's complaint spawned an investigation into her performance. This does not raise an inference of pretext in these circumstances. By filing a complaint, Plaintiff does not become immune from adverse employment actions based on subsequently discovered misconduct or poor performance. *See Chivers v. Wal–Mart Stores, Inc.*, 641 F.3d 927, 933 (8th Cir.2011) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999)).

▉ Defendant's request for performance evaluations was not a cause for concern, but its relationship to the unwarranted assumptions of misconduct from Don Lamb's report is. Lamb reported the following to Mike Ernat, who forwarded the message to Schadt:

"While the Safety Director was there the last week on Tuesday or Wednesday I noticed a huddle around Ali's computer at the other end of the trailer and I thought this is not good they are supposed to be working, I walk to the other end of the trailer to find Ali, James League, James Brestel, and Gary Davis looking at the computer going over background checks and arrest records of some of Northwest's employees, as I am about to break it up I hear her say look at this one 14 arrests and one of them is a felony, Vicki must never look at these."

(Defs.' Statement of Material Facts ¶ 110 [15–1]; Defs.' App. 230–31, Email from Lamb to Ernat Nov. 9, 2009 [15–7]). Lamb did not attempt to interpret the incident. But, Schadt, the person who compiled the performance evaluations, added his commentary "Legal: Ali was seen on a job site showing Northwest employees arrest reports she was pulling off of a search site. This is setting us up for potential legal damage." (Defs.' Statement of Material Facts ¶ 114 [15–1]; Defs.' App. 182, Supervisor Summaries [15–6]). Then, Schadt sent an email with the compilation of performance evaluations, which included Lamb's story, Schadt's commentary, and numerous negative critiques of Plaintiff from other employees. (Defs.' Statement of Material Facts ¶ 114 [15–1] (citing Defs.' App. 175–82, Supervisor Summaries [15–6])). Next, Hester called

---

**10.** The fact that Plaintiff disputes the appropriateness of the action does not change the fact that the content of the meeting focused on a legitimate business activity of evaluating an employee's performance.

Huber because he was alarmed by the seriousness of the information that Plaintiff had accessed arrest records which he took to be indicating Plaintiff had broken the law by getting employee criminal histories from the NWMI background checks and telling other employees about them. Huber agreed with Hester that Plaintiff might have to be terminated. (*Id.* at ¶ 120–22 [15–1] ). Hester then promptly fired Toppert without allowing her to respond to the allegations. (Pl.'s Statement of Material Facts ¶ 52 [20–2] ).

A reasonable jury could find that the deficiencies in the investigation were so great that the privacy law violation reason for termination was pretextual. In fact, there was no investigation beyond Lamb's report and Schadt's commentary. First, a jury may find it curious that Hester appeared to unquestioningly accept as true Schadt's assumption and assessment of the situation, when the source of the employee arrest record information Plaintiff was discussing was readily verifiable by minimal investigation, the starting point of which would be an explanation from Plaintiff. *See Mastro v. Potomac Electrical Power Co.,* 447 F.3d 843, 855 (D.C.Cir.2006). Second, the jury might consider that what Schadt had to say could not in good faith be taken at face value because he had an obvious motive to paint Plaintiff in an unfavorable light. He was the person who Plaintiff complained bullied her. Finally, if the concern was that Plaintiff might have exposed the company to legal liability, the jury might think a reasonably informed termination would require the company to seek competent legal advice in light of the true facts, rather than accept Schadt's opinion.

▮ If the deficient investigation permits a finding of pretext, there must still be evidence that it was a pretext, at least in part, for sex discrimination. There is

evidence inconsistent with the notion Plaintiff's gender was a motivating factor. Hester had promoted Plaintiff six months earlier. Just days before Plaintiff met with Schadt, Hester sent her the following email: "I would like to set up a plan for the additional training that you need as well as the events that you would find beneficial for networking. Please send me a list that is your best guess so far for additional training as well as the networking/COEd Event." (Def.'s App. 225, Hester Email Nov. 4, 2009 [15–7] ). This suggests he intended to continue to employ Plaintiff into the foreseeable future and that she was performing her job satisfactorily.

An employment decision may be made for a combination of reasons, some legitimate, some not, hence the "motivating factor" standard. There is also evidence from which the jury could find that gender played a role in Plaintiff's termination, not so much in bias on Hester's part, but an appreciation her gender was a source of the workplace animosity toward her and of the evident personal dislike many of the male employees advanced in their comments about her. This, the jury might think, could be seen in comments like Schadt's referring to Plaintiff that "we need to cut her balls off," and of male employees, most prominently Mike Ernat, referring to Plaintiff's supposed sexual activity and suggestive attire. (*See* Defs.' App. 196, Email from Schadt to Ernat Oct. 30, 2009 [15–6]; Defs.' App. 178 [15–6] ). Similarly, critiques of Plaintiff being too confrontational, flirty, and unprofessional may, in context, be seen as gender stereotyping when, for example, compared to the positive comment about safety assistant Darrell Thompson that he would "stand up to the guys." (*See* Defs.' Reply to Pl.'s Statement of Material Facts ¶ 63 [21]; Defs.' App. 217 [15–7]; Defs.' App. 191,

Email from Ernat to Schadt Nov. 5, 2009 [15–6] ). To be sure, the evidence is disputed, and it is not compelling, but viewing the summary judgment record favorably to Plaintiff as the Court must, the unwarranted allegation of misconduct, its acceptance without investigation or response from Plaintiff, the tie between the misconduct allegation and the evaluation of Plaintiff's performance, together with what can be seen as an undercurrent of gender hostility reflected in comments about Plaintiff by male employees are sufficient to make a triable issue on Plaintiff's claim that her gender was a motivating factor for her discharge. **Defendant's Motion for Summary Judgment is denied on Count I.**

### c. Did Defendant treat a similarly situated male more favorably, providing pretext?

 Though not determinative, a brief discussion of this issue is appropriate. "The employee may demonstrate pretext by showing that 'it was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case.'" *Ridout v. JBS USA, LLC,* 716 F.3d 1079, 1084 (8th Cir.2013) (quoting *Erickson,* 271 F.3d at 727). This may be done by showing that there was a man who was "'similarly situated in all relevant respects'" to the plaintiff, but the defendant did not terminate the man. *See id.* at 1085 (quoting *Lynn v. Deaconess Med. Ctr.-W. Campus,* 160 F.3d 484, 487, 488 (8th Cir. 1998)). The Court will consider whether the comparator and the plaintiff were in the same position, had the same supervisor, and committed infractions of "comparable seriousness." *Id.* (quoting *Lynn,* 160 F.3d at 488); *Wimbley v. Cashion,* 588 F.3d 959, 962 (8th Cir.2009); *Barber v. C1 Truck Driver Training, LLC,* 656 F.3d 782, 796–97 (2011) (stating that at the pretext stage evidence should establish that the comparator employee and the plaintiff were "involved in or accused of the same offense"). The comparator does not need to be the plaintiff's "clone." *Ridout,* 716 F.3d at 1085 (quoting *Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908, 916 (7th Cir.2010)).

Plaintiff has tried to establish that Defendant's assertion that she violated privacy laws was a pretext for discrimination because a male employee committed a privacy violation of comparable seriousness to the violation which Defendant accused Plaintiff. Plaintiff alleges that Peter Strupp, who was a site supervisor, wrote on a table talk sheet, next to an employee's name "DDD," which allegedly stood for Dirty Dick Dillion.

Plaintiff states that this revealed that Strupp had exposed a subordinate's diagnosis with a sexually transmitted infection in violation of privacy laws, and Strupp was mocking him for contracting the infection. Plaintiff asserts that Strupp gained this knowledge because Dillion submitted a doctor's note. Plaintiff states she knew there was an investigation because it occurred when she was the safety assistant and her former supervisor Malone asked her to pull the table talk sheets, on one of which "DDD" had been written. She assumes no discipline was taken. In support of these allegations, Plaintiff offers her own testimony and that of her former colleague and friend Vicki Techau, who is recounting what Plaintiff told her. (*See* Pl.'s App. 105, Techau Dep. 34–35 [20–6]; *compare* Pl.'s Statement of Material Facts ¶ 54 [20–2] (citing Pl.'s App. 57, Techau Dep. 116–18; Toppert Dep. 116–18 [20–5] ) *with* Defs.' Reply to Pl.'s Statement of Material Facts ¶ 54 [21] (citing Pl.'s App. 111, Techau Dep. 116–18 [20–6] )). Defendant concedes that an investigation was undertaken, but there is no evidence in the record regarding the outcome of the investigation or how, if at all, Strupp was pun-

ished. (*Compare* Pl.'s Statement of Material Facts ¶ 55 [20–2] *with* Defs.' Reply to Pl.'s Statement of Material Facts ¶ 55 [21] ).

Plaintiff's difficulty here is that the record is simply too incomplete to demonstrate Strupp's situation was comparable. The Court has only Plaintiff's characterizations and conclusions about what occurred or the investigation that ensued.

### 3. Reason No. 2: Poor Performance

Defendant has framed poor performance and violation of privacy laws as two independent, legitimate non-discriminatory reasons. However, stated numerous times now, Hester's deposition reveals the principal reason for termination was the privacy issue. As noted, in its Statement of Material Facts, Defendant admits that "Hester would not have terminated Toppert but for his belief Toppert violated privacy rights." (¶ 124 [15–1] (citing App. 26–27, 34, Hester Dep. 20, 74–76 [15–2] )). It is enough here to note that whether Plaintiff was satisfactorily performing her job is disputed and the issue is inextricably intertwined with the misconduct reason. Plaintiff need only raise an inference of discrimination on one legitimate reason in order to survive summary judgment and here she has done so on the main reason. *See McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860–61 (8th Cir.2009) (citing *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir.2008)).

### E. Retaliation

Title VII also prohibits an employer from retaliating against an employee for participating in an investigation or opposing discrimination. *Hunt v. Nebraska Public Power Dist.*, 282 F.3d 1021, 1028 (8th Cir.2002) (citing *Brower v. Runyon*, 178 F.3d 1002, 1005 & n. 3 (8th Cir.1999)). "To establish a prima facie case of retalia-

tion under Title VII, a plaintiff must show that (1) she was engaged in a protected activity (opposition or participation); (2) she suffered an adverse employment action; and (3) the adverse action occurred because she was engaged in the protected activity." *Id.* (citing *Coffman v. Tracker Marine*, 141 F.3d 1241, 1245 (8th Cir. 1998)). Once the plaintiff establishes the prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason. The plaintiff has the ultimate burden of persuasion to establish that the defendant's reason is pretext for retaliation. *Id.*

To establish that she engaged in a protected activity, a plaintiff must provide evidence that 1) she complained about an adverse employment action or poor treatment and 2) she attributed the complained of activity, treatment, or action to sex discrimination. In *Hunt v. Nebraska Public Power District*, the Eighth Circuit held that the plaintiff was unable to establish that she engaged in a protected activity because although "[she] complained that she was entitled to a pay increase and a change in job title, she did not attribute [her employer's] failure to give her a raise or promotion to sex discrimination." 282 F.3d at 1028–29. It must appear that the plaintiff is engaging in a *protected* activity as opposed to launching a general complaint that is unrelated to discrimination prohibited by Title VII. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663–64 (7th Cir.2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to created that inference, is insufficient").

Plaintiff alleges she was opposing sex discrimination and/or sexual harassment by emailing Hester and reporting the details of the meeting with Schadt. However, nowhere in the email to Hester does

she give any indication that she believed that Schadt's actions were motivated by her sex; nor is it objectively apparent that Schadt's actions were motivated by her sex.

A plaintiff may survive summary judgment even if she does not explicitly invoke her protected status as the reason for the complaint, but there must be some evidence for the jury to weigh. In *Buettner v. Arch Coal Sales Co., Inc.*, the Eighth Circuit held that where a plaintiff did not explicitly say she was complaining about sex discrimination there is still a triable issue regarding whether the plaintiff "had a good faith, reasonable belief that at least one of the statements she relayed to Quinn violated the law." 216 F.3d 707, 714–15 (8th Cir.2000). The court's holding considered the following facts as supporting the plaintiff's argument that she engaged in protected activity:

> (1) on March 17, 1995, Buettner wrote to Jeffrey Quinn (Quinn) regarding her concern that Panzarino would not conduct a fair evaluation of her and that she might fall behind male employees in salary; (2) on June 15, 1995, Buettner e-mailed Quinn implying Patrick Panzarino (Panzarino) called ·her "too aggressive"; (3) Buettner complained to Quinn that Panzarino made a discriminatory comment to co-worker, Jennifer Russell; and (4) Buettner told Jane Fox, Director of Personnel Services, and Mike McKown, Vice President of Human Resources, on June 22, 1995, that Panzarino had a "problem with women."

*Id.* at 714 n. 7.

▆ Plaintiff's email to Hester does not resemble Buettner's email to Quinn. Plaintiff's email had no mention of a disparate impact between male and female employees, no discussion of discriminatory comments, nor any invocation of sexism. (*See* Defs.' App. 172 [15–6] (providing a copy of the email)). Plaintiff strongly indicated that she thought the meeting and Schadt's actions were unfair. She claimed that he was bullying her in violation of the company bullying policy. But, Plaintiff gave no indication that she thought the meeting with Schadt and its alleged harassing nature had anything to do with sex. Similarly, during the investigation of her bullying complaint when Plaintiff met with Huber and Erps, Plaintiff did not say anything about Schadt's alleged bullying that explicitly or implicitly communicated a belief that the bullying was related to gender.

Plaintiff cannot establish a retaliation claim without establishing that she in good faith believed she was engaging in a protected action. It does not violate Title VII for an employer to retaliate against Plaintiff for reporting bullying. Because Plaintiff did not give any indication to her employer that she thought Schadt treated her poorly on the basis of her sex, she cannot establish that she engaged in a protected activity. Thus, the Court does not consider whether Plaintiff can meet her ultimate burden of establishing Defendant's reason was pretext. **Plaintiff's retaliation claim fails as a matter of law; Defendant's Motion for Summary Judgment is granted on Count III.**

### III.

### CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment [15] is **granted in part and denied in part in accordance with the foregoing.** Summary judgment is granted on all Iowa Civil Rights Act claims, all Davenport Civil Rights Act claims, the Title VII hostile environment claim, and the Title VII retaliation claim. Count I is the sole remaining count. Plaintiff may proceed to trial on her Title

VII discriminatory discharge claim against Defendant Northwest Mechanical, Inc. The claims against Defendant Schadt are dismissed.

IT IS SO ORDERED.

